GREAT LAKES QUICK LUBE, LP, Plaintiff-Appellant,

v.

CITY OF MILWAUKEE, Defendant-Respondent.

Court of Appeals

*No. 2009AP2775. Submitted on briefs September 7, 2010.*
*—Decided December 14, 2010.*

2011 WI App 7

(Also reported in 794 N.W.2d 510.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs *Alan H. Marcuvitz* and *Susan M. Sager* of *Michael Best & Friedrich LLP* of Milwaukee.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Amy R. Seibel* of *Seibel Law Offices, LLC* of Mequon and *Grant F. Langley*, city attorney and by *Vincent D. Moschella*, deputy city attorney of Milwaukee.

Before Fine, Kessler and Brennan, JJ.

¶ 1. KESSLER, J. Great Lakes Quick Lube, LP, (Great Lakes), as tenant and agent of the entities that own four separate parcels of real estate involved in this litigation, is responsible under its lease for payment of property taxes each year. Pursuant to Wis. Stat. § 74.37(3)(d) (2007–08),[2] Great Lakes sued for refunds of property taxes it paid to the City of Milwaukee for the years 2006 and 2007. The complaint challenges as excessive the City of Milwaukee's real estate tax assessment of the four properties, and asserts that the assessment violated the uniformity requirement of Article VIII, Section 1 of the Wisconsin Constitution. The trial court found that the City's assessments complied with

[2] All references to the Wisconsin Statutes are to the 2007–2008 version unless otherwise noted.

the requirements set forth by Wɪѕ. Sᴛᴀᴛ. § 70.32(1) and the assessment methodology of the Wisconsin Property Assessment Manual.[3] The trial court also found that Great Lakes provided "no credible evidence" to show the City's assessments violated the Wisconsin Constitution. Great Lakes appeals. We affirm.

## BACKGROUND

¶ 2. In September 2004, the real estate in question, and the Valvoline Instant Oil Change businesses operated thereon, had been part of a larger group of forty-seven such businesses, located on twenty-nine parcels of real estate, which were owned, and eighteen parcels which were leased, by a number of Wisconsin limited liability companies, and an Illinois corporation. These entities, in an Asset Purchase Agreement dated September 22, 2004, agreed to sell the businesses and real estate to three individuals ("the Equity Owners") and Great Lakes. The purchase price agreed upon was $26,600,000, subject to various adjustments at closing. In addition, the parties agreed to "allocate[] the Purchase Price among the various Acquired Assets as set forth [in the Agreement]." The Agreement also required the parties to *not take a position . . . in any judicial proceeding, that is inconsistent with the terms of this Section.* (Emphasis added.) Sellers and Great Lakes are unrelated parties.

¶ 3. On November 9, 2004, Great Lakes, as Assignor, and CRIC Great Lakes Acquisition LLC ("CRIC"), a Delaware limited liability company, as Assignee, entered into a "Partial Assignment and Assump-

---

[3] Wɪѕᴄᴏɴѕɪɴ Sᴛᴀᴛ. § 73.03(2a) requires the Department of Revenue to publish manuals discussing and illustrating accepted assessment methods.

tion of Asset Purchase Agreement." Great Lakes assigned the rights it had to purchase the twenty-nine parcels of real estate under the Asset Purchase Agreement to CRIC. CRIC and Great Lakes are unrelated parties.

¶ 4. Also on November 9, 2004, Great Lakes and CRIC entered into separate lease agreements covering operation of the businesses on each of the properties. Great Lakes (as Tenant) and CRIC (as Landlord) agreed that Great Lakes would: operate the businesses; pay CRIC or its assignee a specifically defined rent; and that:

> this Lease is *a true lease and does not represent a financing arrangement* . . . [E]ach party shall reflect the transactions represented by this Lease . . . in a manner consistent with 'true lease' treatment rather than 'financing' treatment.

(Emphasis added.)

¶ 5. The following day, on November 10, 2004, the transaction represented by the Asset Purchase Agreement closed. CRIC acquired all of the real estate and Great Lakes acquired all leasehold interests. Three parcels of real estate from this transaction are located in the City of Milwaukee.[4]

¶ 6. On November 16, 2004, CRIC filed Wisconsin Real Estate Transfer Returns for the three properties it acquired on November 10, 2004. We refer to each by the street on which it is located. The transfer returns reported the sale price of each property. Each transfer return specifically represented either that there was no

---

[4] The three parcels in the City of Milwaukee were acquired in this 2004 bulk transaction. The fourth parcel involved in this case was acquired a few months later from a different seller, but utilizing the substantively identical process and documents.

142

financing involved or made no claim that there was any financing. The 2004 sale prices that CRIC reported for each property on the transfer returns were:

| | |
|---|---|
| West Brown Deer Road | $ 404,700 |
| East North Avenue | $ 1,118,300 |
| West Silver Spring Drive | $ 713,600 |

¶ 7. In November 2005, the Pen-Ten Group[5] sold three real estate parcels in Wisconsin, together with the oil change businesses operating on those properties, to "CRICINT I BETA." The trial court found that CRICINT I BETA was "for all practical purposes . . . the same entity as the 'CRIC' buyer in the 2004 bulk transaction." Thus, we also refer to the purchaser of the real estate in this transaction as CRIC. The mechanics of the 2005 transaction were identical to those we have described in connection with the 2004 bulk sale; only the names of the parties and the price paid differed. As in the 2004 bulk sale, Great Lakes acquired the leases and CRIC acquired the real estate. Also as in the 2004 bulk sale, CRIC filed a Wisconsin Real Estate Transfer Return for the acquired Pen-Ten property, which was located on South 68th Street in the City of Milwaukee. CRIC reported the sale price as $1,830,000 and the financing as "Financial Institution, conventional."

¶ 8. Later, CRIC sold each of the real estate properties it had acquired in the above two transactions to a variety of individual owners.[6] In 2005 and 2006, CRIC again filed Wisconsin Real Estate Transfer Re-

---

[5] No one claims that Pen-Ten is a related party to either CRIC or to Great Lakes.

[6] The properties were sold through an extensive broker network, including internet listings.

turns for each of these subsequent four sales. CRIC reported the subsequent sale prices of each City of Milwaukee property as:

| | |
|---|---|
| West Brown Deer Road | $ 487,200 |
| East North Avenue | $ 1,350,000 |
| West Silver Spring Drive | $ 830,000 |
| South 68th Street | $ 2,063,000 |

These returns either made no representation as to the nature of the financing, if any, or reported "no financing involved," "financial institution conventional" or financing by an "other 3rd party."

¶ 9. The City's assessments of the four properties for 2006 and 2007 were based on the values set forth below.[7] Great Lakes paid the taxes levied, then sued for refunds claiming that the taxes were excessive because the fair market value of each property on January 1, 2006, was no more than the amounts set out below.

| | City-2006 | City-2007 | Great Lakes |
|---|---|---|---|
| West Brown Deer Road | $ 487,200 | $ 487,200 | $ 235,210 |
| East North Avenue | $ 1,350,000 | $ 1,350,000 | $ 327,200 |
| West Silver Spring Drive | $ 830,000 | $ 830,000 | $ 154,890 |
| South 68th Street | $ 1,733,000 | $ 2,063,000 | $ 426,870 |

¶ 10. At trial, Great Lakes argued that "creative financing" in the form of a sale-leaseback transaction inflated the sale prices. The trial court found a sale-

[7] The 2006 assessment for South 68th Street was based on the November 2005 purchase price, less $97,000 that represented personal property in the sale. The property was sold to another investor in 2006.

leaseback to be defined as "a sale and subsequent lease given by the buyer back to the seller as part of the same transaction." Specifically, the trial court found that this was *not* a sale-leaseback arrangement because "[a]t no time during any of the transactions were the properties being sold, [or] leased back to the entity selling them," nor was there "any special financing that impacted the sale prices or the rents determined under the leases."

¶ 11. The court also found the testimony of the Great Lakes chief financial officer, Dorothy Ramsey, to be unpersuasive and unconvincing that the rent under the leases was greater than market rate.[8] The rent in the leases, according to Ramsey's testimony, was approximately 9.4% of the allocated sales prices. The court found instead that "the leases were at market rents and . . . the first bulk sale . . . did not affect the market value of the purchase prices of the properties . . . [T]he transactions reflect the nature of today's markets for the sales of single tenant investment properties."

¶ 12. The trial court also rejected the opinions of the expert retained by Great Lakes, S. Steven Vitale. The court found that: (1) Vitale's conclusion was directly contradicted by the Wisconsin Real Estate Transfer Returns filed by CRIC as purchaser of the real estate; (2) "Vitale did not conduct any independent investigation as to whether or not the transaction involved a legitimate real estate sale-leaseback," but instead simply accepted Ramsey's testimony as fact; and (3) Vitale's analysis was flawed because "the lease information used as the basis for his opinion was

---

[8] The trial court found: "Ms. Ramsey's background, expertise and bias as CFO of Great Lakes Quick Lube were insufficient to conclude that the contract rents, paid under the leases, were greater than market rents."

obtained directly from the plaintiff and . . . he did not independently verify the information or circumstances of those leases and rents." The trial court concluded that "Vitale's opinions and testimony relative to the market rate of rents [were] based on biased and inadequate information and [were] of minimal probative value." Vitale conceded that the methodology he followed was not set out anywhere in the Wisconsin Property Assessment Manual.

¶ 13. The trial court concluded that the City followed the requirements of Wis. Stat. § 70.32(1), and of the Wisconsin Property Assessment Manual, and that "the sales of the subject properties were arm's-length transactions . . . [T]he City of Milwaukee properly considered those transactions in reaching its valuation of the properties."

## STANDARD OF REVIEW

■

¶ 14. A claim of excessive tax assessment, under Wis. Stat. § 74.37(3)(d), requires review of "the record made before the circuit court, not the board of review." *Adams Outdoor Adver., Ltd., v. City of Madison*, 2006 WI 104, ¶ 24, 294 Wis. 2d 441, 717 N.W.2d 803. Wisconsin Stat. § 70.49(2) requires the reviewing court, like the circuit court, to give presumptive weight to the City's assessment, unless the challenging party presents "significant contrary evidence." *Adams*, 294 Wis. 2d 441, ¶ 25. Failure to make an assessment on the statutory basis is an error of law. *State ex rel. Boostrom v. Board of Review of the Town of Linn*, 42 Wis. 2d 149, 156, 166 N.W.2d 184 (1969). Whether the City followed the statute in making its assessment is a question of statutory interpretation that we review *de novo. Adams*, 294 Wis. 2d 441, ¶ 26.

¶ 15. Where there is conflicting testimony, the fact finder is the ultimate arbiter of credibility. *Id.*, ¶ 27 (" 'The weight and credibility to be given to the opinions of expert witnesses is 'uniquely within the province of the fact finder.' ") (citation and one set of quotation marks omitted). "Applying the law to the facts presents a question of law that we review independently of the circuit court." *Id.* Therefore, whether an expert opinion on the fair market value of property is based on factors required by Wisconsin law is a question of law which we review *de novo.*

## DISCUSSION

*Fair Market Value*

¶ 16. WISCONSIN STAT. § 70.32(1) sets forth the requirements for the evaluation of real property and requires assessors to follow the mandates outlined by the Wisconsin Property Assessment Manual. The statute provides:

> Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under s. 73.03(2a) from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale. In determining the value, the assessor shall consider recent arm's-length sales of the property to be assessed if according to professionally acceptable appraisal practices those sales conform to recent arm's-length sales of reasonably comparable property; recent arm's-length sales of reasonably comparable property; and all factors that, according to professionally acceptable appraisal practices, affect the value of the property to be assessed.

¶ 17. We explained the three-tier hierarchy described in the assessment manual that must be applied to determine the fair market value of property for tax assessment:

> The *Property Assessment Manual* and case law set forth a three-tier assessment methodology to determine a property's full value. Evidence of an arm[']s-length sale of the subject property is the best evidence of true cash value. [Tier 1] If there has been no recent sale of the subject property, an assessor must consider sales of reasonably comparable properties. [Tier 2] *Only if there has been no arm[']s-length sale and there are no reasonably comparable sales may an assessor use any of the third-tier assessment methodologies.* [Tier 3]

*Allright Props., Inc. v. City of Milwaukee*, 2009 WI App 46, ¶ 11, 317 Wis. 2d 228, 767 N.W.2d 567 (citing *Adams*, 294 Wis. 2d 441, ¶ 34) (some formatting altered; second emphasis supplied; brackets in *Allright*).

¶ 18. When a recent arm's-length sale is available, it is error to consider factors extrinsic to that sale. *Darcel, Inc. v. City of Manitowoc Bd. of Review*, 137 Wis. 2d 623, 624, 405 N.W.2d 344 (1987). ("[A]n arm[']s-length sale price is the best indicator to determine fair market value for property tax purposes and an approach that considers factors extrinsic to the arm[']s-length sale is not statutorily correct and therefore in error as a matter of law."); *State ex rel. Markarian v. City of Cudahy*, 45 Wis. 2d 683, 686, 173 N.W.2d 627 (1970) (" '[I]t is error to use [the third-tier] method 'when the market value is established by a fair sale of the property in question or like property.' ") (citation omitted). An opinion as to value which ignores the statutory factors is not "significant contrary evidence" necessary to overcome the presumption that the assess-

ment is valid. *See Adams*, 294 Wis. 2d 441, ¶¶ 25–26; *see also id.*, ¶ 56 ("No presumption of correctness may be accorded to an assessment that does not apply the principles in the Property Assessment Manual.") (italics omitted).

¶ 19. As we have seen, and as the trial court found, the City relied on actual recent sales of the subject properties in determining the fair market value. The City determined, and the trial court found, that those sales were all arm's- length transactions, and that the City provided "an accurate appraisal of the disputed properties." To overturn the trial court's findings, Great Lakes bears a heavy burden. It must persuade this court that the formula suggested by Great Lakes's attorney, and used by its expert to determine the value of the property, complies with the requirements of Wisconsin law, and that the formula overcomes the presumption that the City properly determined the value of the property. *See Allright*, 317 Wis. 2d 228, ¶ 31 (If a "valuation approach [is] not consistent with the Property Assessment Manual, [it does not] . . . constitute 'significant contrary evidence' to rebut the statutory presumption that the City's assessment was correct.") (italics and citation omitted).

¶ 20. Great Lakes argues that the 2004 and 2005 original bulk sales actually "involved creative financing arrangements" which disqualify those sales as a proper basis for appraisal. Great Lakes makes this argument based in large part on *Walgreen Co. v. City of Madison*,[9] 2008 WI 80, 311 Wis. 2d 158, 752 N.W.2d 687. In *Walgreen*, it was undisputed[10] that the rent under the

[9] The Wisconsin Supreme Court refers to Walgreen Co. as "Walgreens" throughout the text of its opinion. We do the same.

[10] The Wisconsin Supreme Court noted that:

lease agreement was higher than the market rate because the developer's cost of constructing the building to Walgreens' specifications was built into the rental figure.[11] *Id.*, ¶ 6. The City and Walgreens presented competing third-tier analyses of the market value.[12] *Id.*, ¶ 10. Because, apparently, there was no recent sale of

> Walgreens' lease payments . . . include compensation to the developer for all such financing, land acquisition, construction, development and financing costs, together with a profit margin. The parties do not dispute that the inclusion of such costs into the lease terms results in higher than market rate rental payments; as the circuit court described it, the rent in the Walgreens' leases is 'higher than normal' in part because the developer is recovering his development costs on a building that contains the superadequacies demanded by Walgreen.'

*Walgreen Co. v. City of Madison*, 2008 WI 80, ¶ 6, 311 Wis. 2d 158, 752 N.W.2d 687.

[11] The court stated that it was required to "identify the correct methodology for assessing leased retail property for purposes of municipal taxation when the leases for such property contain monthly payments significantly above the market rental rate in part *as a result of certain unique business and financing terms being incorporated into the contractual lease terms.*" *Walgreen*, 311 Wis. 2d 158, ¶ 18 (emphasis added).

[12] Walgreens' appraiser

> 'appraised the fee simple interest in the two properties without consideration of the lease, while [the City's appraiser] appraised the leased fee interest.' The appraisals presented by Walgreens described using all three primary appraisal approaches . . . the cost approach, sales comparison approach, and income approach—while placing the greatest emphasis on the latter two approaches. In contrast, the City appraisal used only sales comparison and income approaches for [one property], . . . while ultimately basing its assessment solely on numbers derived from its income approach analysis. It

the subject property with the improvements, and no comparable sales, the court determined which of the third-tier methods those specific facts required in order to satisfy the requirements of the statute and guidance of the Property Assessment Manual. *Id.*, ¶ 11 (describing the difference between the City's and Walgreens' analyses). The *Walgreen* court acknowledged that a sale price might include financing that moved the sale beyond fair market value, and that appraisers should examine the sale to determine whether that occurred. *Id.*, ¶¶ 55–56.

¶ 21. Great Lakes argues here that the "creative financing" in CRIC's original purchases was actually a sale-leaseback, which inflated both the original sales price, and the prices later paid by the individual buyers in 2005, because the leases involved above market rate rents. Great Lakes argues that the third-tier method of appraisal, based on income only from market rate rents, must be used to determine the market value. Vitale characterized both sales as "sale-leaseback" transactions[13] based on Ramsey's testimony.

¶ 22. To value the property, Vitale applied a formula based on his estimate of "market rents" and his understanding from Great Lakes of the rental income in the leases. The formula used was specifically re-

---

used only an income approach for the [other] property, after concluding there were no comparable property sales.

*Walgreen*, 311 Wis. 2d 158, ¶ 10 (internal quotation marks and footnotes omitted).

[13] Vitale agreed that a "sale leaseback" is "a transaction in which an operating entity that controls or owns a property makes a sale of the property and then leases the property back" and that "the seller would be leasing the property back."

quested by Great Lakes's attorney.[14] The formulas required calculating figures representing "stabilized market rent" and "risk and rental growth-adjusted capitalization rate." These, in turn, were used to calculate what Vitale described as a "Leased Fee Market Value" and a "Fee Simple Market Value." Based on the lesser of these two values, he concluded that the "market value subject to taxation" for each property, was:

| | |
|---|---|
| West Brown Deer Road | $330,000 |
| East North Avenue | $565,000 |
| West Silver Spring Drive | $205, 000 |
| South 68th Street | $1,035,000 |

¶ 23. Because of his belief that the original transactions involved "sale- leasebacks," Vitale concluded that the sales price of both the original bulk sales and the subsequent sales to individual owners were inflated. Therefore, Vitale did not consider those sales in coming to his opinion regarding the values of the four properties. The second-tier factors—recent sales of comparable properties—which Vitale's report considered, included only a few comparable properties in other parts of the Midwest, and were only used in connection with rates he applied in his formulas. The properties were never considered as evidence of fair market value in tier two.

¶ 24. Vitale did not perform an independent appraisal, nor did he personally inspect any of the properties. Rather, he "placed heavy reliance in [his] analy-

---

[14] Vitale's report to Great Lakes's attorney states: "Per your request, we have utilized the methodology detailed in [an article] authored by Timothy J. Riddiough in estimating the fair market value subject to taxation of these properties."

sis on information provided by the client." Vitale calculated what he described as the "market value subject to taxation."

¶ 25. In response to Great Lakes's litigation, the City of Milwaukee prepared "Retrospective Appraisal Report[s]" of the four properties as of January 1, 2006. The appraisal based the fair market value on the sale price CRIC reported on the Wisconsin Real Estate Transfer Returns for each property. Based on the Wisconsin Real Estate Transfer Returns, the appraiser concluded "there was no relationship between the grantor and grantee and there was no special financing involved in the sale." As required by WIS. STAT. § 70.32(1), the City also considered the recent sales of several comparable automotive service facilities to determine whether it had correctly concluded that the sales prices CRIC reported represented arm's-length transactions. Based on the reported recent sales of the subject properties, and of comparable properties, the City concluded in the Retrospective Appraisal Reports that the subject properties had the following fair market values as of January 1, 2006 and 2007:

| | 2006 | 2007 |
|---|---|---|
| West Brown Deer Road | $487,200 | $487,200 |
| East North Avenue | $1,350,000 | $1,350,000 |
| West Silver Spring Drive | $830,000 | $830,000 |
| South 68th Street | $1,733,000 | $2,063,000 |

¶ 26. As required by WIS. STAT. § 70.32(1), the City verified the arm's-length nature of the transactions and considered recent sales of comparable properties. The sellers were unrelated to the buyers in each transaction and all were unrelated to Great Lakes. In addition,

Great Lakes and CRIC, as parties to the Asset Purchase Agreement, promised "that [they] [would] not take a position . . . *in any judicial proceeding* that [was] inconsistent with the terms of" the Allocation of Purchase Price in the Asset Purchase Agreement. (Emphasis added.) The Wisconsin Real Estate Transfer Returns, filed by CRIC, reported the sales price upon which the City relied, and made no claim that unusual financing was involved in any of the sales. Furthermore, in the lease agreements, Great Lakes specifically agreed they were "true lease[s]" not something requiring "financing treatment," and that Great Lakes would "reflect the transactions represented by this Lease . . . consistent with 'true lease' treatment rather than 'financing' treatment." Great Lakes does not explain why its clear prior admissions of fact should be ignored.

¶ 27. There is significant evidence to support the trial court's findings. The City's appraisals complied with the requirement of Wis. Stat. § 70.32(1) and the Property Assessment Manual that, if available, a recent sale of the subject property be used to establish the value. The appraisal formula urged by Great Lakes was a third-tier method under § 70.32(1). The trial court properly rejected this formula because there were recent arm's-length sales of the subject properties. The trial court's finding that the leases did not reflect above market rents is supported by the evidence, including the trial court's assessment of the credibility and probative value of expert testimony. *Walgreen* does not require a contrary result. *See generally Walgreen*, 311 Wis. 2d 158. Unlike the facts in *Walgreen*, here there were arm's-length sales that the court determined established fair market value in compliance with § 70.32(1) and the Property Assessment Manual. There were no sale-

154

leasebacks because the seller of the real estate never leased the properties back from the buyer. The lease rents did not include other "creative financing" costs which pushed the leases beyond market rates. Thus, Great Lakes has not met its burden in establishing that the City's assessments were excessive.

¶ 28. We affirm the trial court's conclusion. The City properly assessed the subject properties for the years 2006 and 2007.

*The Uniformity Clause*

■■

¶ 29. Article VIII, section 1 of the Wisconsin Constitution, provides in relevant part: "The rule of taxation shall be uniform but the legislature may empower cities, villages or towns to collect and return taxes on real estate located therein by optional methods." This provision "requires that the method or mode of taxing real property must be applied uniformly to all classes of property within the tax district." *State ex rel. Levine v. Board of Review of Village of Fox Point*, 191 Wis. 2d 363, 371, 528 N.W.2d 424 (1995). Where there is evidence that the assessor used an arbitrary methodology for assessing property by singling out one property for special treatment, under a mistaken view of proper assessment practice, the assessment cannot withstand a uniformity challenge. *Noah's Ark Family Park v. Board of Review of Village of Lake Delton*, 216 Wis. 2d 387, 394, 573 N.W.2d 852 (1998). An assessor cannot elect to reassess only a single property (such as a water park) within a class of similar properties (other recently sold commercial properties). *Id.* at 388–89. Similarly, where the assessor assessed older homes at less than the sale price because he believed purchasers were

overpaying for older homes as compared to newer homes, "the assessor clearly failed to use the best information available when he ignored the purchase price of certain older properties in assessing their value. By using arbitrary and improper considerations in making the assessment, the assessor violated sec. 70.32(1), Stats., and committed an error of law." *Levine*, 191 Wis. 2d at 374.

¶ 30. Here, there is no evidence that all other similarly zoned properties were systematically assessed at less than fair market value. *See id*. There is also no evidence that Great Lakes was arbitrarily singled out for reassessment based on factors equally applicable to properties not reassessed. *See Noah's Ark*, 216 Wis. 2d at 394. Great Lakes, therefore, has not established that the City committed any errors which would constitute violations of the uniformity clause.

¶ 31. Simply comparing a taxpayer's appraised value to lower values assigned to a relatively small number of other properties has long been rejected as a claimed violation of the uniformity clause. In *Walthers v. Jung*, 175 Wis. 58, 60, 183 N.W. 986 (1921), realtors, through Walthers, their attorney, challenged the appraisal of their land as being higher than several other parcels of similar real estate in the township. Our supreme court rejected the challenge, observing that if such a method of challenge was allowed, then "assessments [would] have a precarious stability, because common knowledge informs us that the average taxpayer can conscientiously testify that his holdings are valued too high in comparison with that of certain of his neighbors." *Id*. at 60–61. Later, relying on *Walthers*, we held that lack of uniformity must be established by showing "a general undervaluation of properties within

[a] district" when the subject property has been assessed at full market value. *See State ex rel. Algoma Hous. Co. v. Board of Review*, 166 Wis. 2d 675, 682, 480 N.W.2d 786 (Ct. App. 1991).

¶ 32. In *Allright*, the taxpayer's expert compared the assessed value per-square-foot of properties along the same street to the per-square-foot assessed value of the taxpayer's property. *Id.*, 317 Wis. 2d 228, ¶ 56. Not surprisingly, the selected properties had lower per-square-foot assessed values than the taxpayer's property. *Id.* In *Allright*, as in *Walther*, the only evidence was that some assessed values were lower than the assessed value of the taxpayer's property. *Allright*, 317 Wis 2d. 228, ¶¶ 55–56; *Walther*, 175 Wis. at 59–60. Our supreme court's observation in 1921 remains equally apt now—if a violation of the uniformity clause can be established merely because some assessments in the assessment district are lower than the assessment of the taxpayer's property, assessments would have a "precarious stability," because any taxpayer could claim that his properties are valued too high in comparison with surrounding properties. *See Walther*, 175 Wis. at 60–61. Here we have only the same conclusory type of evidence presented in *Walther* and *Allright*—some properties are valued lower than the taxpayer's properties. There is not a shred of evidence of systematic lower assessment of a class of property, nor evidence of arbitrary over-valuing of the taxpayer's properties.

¶ 33. We conclude that Great Lakes has not established a violation of Article VIII, section 1 of the Wisconsin Constitution. We affirm the trial court in all respects.

*By the Court.*—Order affirmed.