FOREST COUNTY POTAWATOMI COMMUNITY,
Plaintiff-Appellant,

SOKAOGON CHIPPEWA COMMUNITY,
Plaintiff-Co-Appellant,

v.

TOWNSHIP OF LINCOLN, Wisconsin,
Defendant-Respondent.

Court of Appeals

*No. 2007AP2523. Submitted on briefs August 12, 2008.
—Decided September 16, 2008.*

2008 WI App 156

(Also reported in 761 N.W.2d 31.)

363

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Michael B. Apfeld, David G. Peterson* and *John L. Clancy* of *Godfrey & Kahn, S.C.*, Milwaukee.

On behalf of the plaintiff-co-appellant, the cause was submitted on the briefs of *Glenn C. Reynolds* and *Wade M. Williams* of *Reynolds & Associates*, Madison.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Raymond J. Pollen* and *Amy J. Doyle* of *Crivello Carlson, S.C.*, Milwaukee.

Before Hoover, P.J., Peterson and Brunner, JJ.

¶ 1. PETERSON, J. The Forest County Potawatomi Community and the Sokaogon Chippewa Community (the Tribes)[1] appeal a summary judgment dismissing their claim against the Township of Lincoln (the Town) for excessive tax on two forty-acre parcels in Crandon, Wisconsin. The Tribes challenged the assessed value of the land – land often referred to as the Crandon mine site. The assessment was based on a Department of Revenue analysis of an April 2003 sale of the mining company that owned the land. The circuit court concluded the sale was a recent arm's-length sale of the property. The court declined to consider other factors the Tribes claimed affected the land's value.

---

[1] Two of the three parties designated the appellants "the Tribes" in their briefs. Accordingly, we adopt this designation. (The third party designated them "the Taxpayers.")

¶ 2. We conclude the sale of the mining company included not just the two forty-acre parcels but also substantial other land and company assets. The transaction was therefore not a sale of just the property being assessed – which consists of only the two forty-acre parcels. We further conclude this is significant contrary evidence, which rebuts the presumption in favor of the Town's assessment. Accordingly, the circuit court erred by failing to consider the Tribes' evidence of the land's value. We reverse and remand for further proceedings.

## BACKGROUND

¶ 3. The two forty-acre parcels are located on what had been, for several decades, the proposed site of a controversial mining project. In the mid-1970s, Exxon Coal and Minerals Company identified the site as one of the largest zinc-copper ore bodies in North America. Exxon first applied for the necessary permits in 1982. As the permitting process continued over the next two decades, the project changed hands several times. In 1998, Rio Algom—which was later bought by BHP Billiton—purchased Exxon's interest in the project and renamed the permit applicant "Nicolet Minerals Company." In April 2003, BHP Billiton sold the mining company to a local group called Northern Wisconsin Resources Group LLC. In October 2003, Resources Group sold the mining company to the Tribes.[2] The Tribes immediately withdrew all of the company's per-

---

[2] The Tribes paid $8,500,000 for the mineral company, in addition to assuming an $8,000,000 three-year, no-interest loan. Neither party argues this purchase should be considered a recent arm's-length sale of the properties. According to the Tribes, the purchase price exceeds the surface value of the land and other assets because the Tribes paid a premium to prevent

mit applications from the Department of Natural Resources and the Army Corps of Engineers, and placed restrictive covenants on the parcels prohibiting mining of the land.

¶ 4. In 2005, the Tribes received property tax bills of $12,789.90 for each of the parcels. The taxes were based on an assessed value of $733,200 per parcel. The Town's assessor, Mike Childers, had assessed the property using the Department of Revenue's analysis of the April 2003 sale of the mining company. Phillip Sanders, of the Department of Revenue, had reviewed sales information provided to him by BHP Billiton and Resources Group to calculate the equalized values for affected municipalities. Sanders began with the $12,000,000 purchase price. He then accounted for liabilities assumed and adjusted for non-real estate assets, financing, and lakeshore lands.[3] This left a dollar figure that Sanders attributed to all of the Wisconsin real estate involved in the sale. The real estate was spread over several municipalities, one of which was the Town. Sanders broke down the price for each municipality. He allotted $4,086,800 of the sale to property in the Town.

mining proposals in the future and to avoid spending millions of dollars in continued opposition to the mine.

[3] In addition to the $12,000,000 nominal purchase price, Resources Group assumed $715,830 in liabilities. Of the total $12,715,830, $8,000,000 was in the form of a three-year, no-interest loan, which was essentially an option on 600 acres of lakefront property. If Resources Group chose not to pay the $8,000,000, it would simply return the land covered by the note to BHP Billiton. The remaining $4,715,830 was allocated to parcels of recreational land, residential real estate, other real estate (including the Crandon tracts), and three mine hoists located in New Mexico.

¶ 5. The mining company's land in the Town included more than the two forty-acre parcels involved here. Childers, the Town assessor, allocated the $4,086,800 among all the mining company's land. He determined that $1,496,374 of the price should be assigned to the two forty-acre parcels. He split this equally between the parcels, for a fair market value of $748,187 per parcel. Applying an assessment ratio, he assessed the properties at $733,200.

¶ 6. The Tribes paid the 2005 tax bill and then filed a notice of claim for excessive assessment with the Town. When the Town denied their claim, the Tribes sued under Wis. Stat. § 74.37,[4] alleging excessive tax. The Tribes requested damages in the amount of overpaid taxes, and an order requiring the Town to reduce the assessed value. The Tribes claimed the proper fair market value of the parcels was $80,000 each, based on a sales comparison of similar properties and excluding the value of the ore body. The Tribes later amended their complaint to add a claim for excessive taxes paid for 2006.

¶ 7. The Tribes moved for summary judgment. The circuit court reasoned that the April 2003 sale of the mining company was a "recent arm's length transaction of the properties" and the court was therefore precluded from considering other indicia of the properties' value. It then granted summary judgment in favor of the Town.[5]

---

[4] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

[5] Although the Town did not cross-claim for summary judgment, the circuit court granted the Town summary judgment under Wis. Stat. § 802.08(6), which permits a court to award summary judgment to a party against whom a motion for

## DISCUSSION

¶ 8.  We review decisions granting summary judgment independently using the same methodology applied by the circuit court. *Estate of Sustache v. American Family Mut. Ins. Co.*, 2008 WI 87, ¶ 17, 311 Wis. 2d 548, 751 N.W.2d 845. WISCONSIN STAT. § 802.08(2) deems summary judgment appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." WIS. STAT. § 802.08(2).

¶ 9.  We further note this is a review of a judgment on a claim brought under WIS. STAT. § 74.37. In such claims, the circuit court "may make its determination without regard to any determination made at any earlier proceeding." *Nankin v. Village of Shorewood*, 2001 WI 92, ¶ 25, 245 Wis. 2d 86, 630 N.W.2d 141. Although courts give "a city's assessment presumptive weight . . . the assessment is presumed correct only if the challenging party does not present significant contrary evidence." *Walgreen Co. v. City of Madison*, 2008 WI 80, ¶ 17, 311 Wis. 2d 158, 752 N.W.2d 687 (citation and internal quotations omitted).

¶ 10.  Under Wisconsin law, property must be assessed at the "full value which could ordinarily be obtained therefor at private sale." WIS. STAT. § 70.32(1). This value must reflect its "highest and best use." 1

----

summary judgment is brought "even though the party has not moved therefor."

PROPERTY ASSESSMENT MANUAL FOR WISCONSIN ASSESSORS at 7–9, 7–10 (rev. Dec. 2004). To determine a property's full value, assessors must value the property "in the manner specified in the Wisconsin property assessment manual." WIS. STAT. § 70.32(1). The process set forth in case law interpreting § 70.32(1) and the property assessment manual is well known.

> The "best information" of [a property's fair market value] is a sale of the property or if there has been no such sale then sales of reasonably comparable property. In the absence of such sales, the assessor may consider all the factors collectively which have a bearing on the value of the property in order to determine its fair market value.

*State ex rel. Markarian v. City of Cudahy*, 45 Wis. 2d 683, 686, 173 N.W.2d 627 (1970). Our supreme court has characterized this process as a three-tier methodology. A recent arm's-length sale of the property is the best evidence of value. If there is no recent arm's-length sale, then sales of comparable properties may be considered. If neither a recent arm's-length sale nor comparable sales has occurred, then all other factors may be considered. *Adams Outdoor Adver., Ltd. v. City of Madison*, 2006 WI 104, ¶ 34, 294 Wis. 2d 441, 717 N.W.2d 803.

¶ 11.   The Tribes acknowledge that a recent arm's-length sale is generally the best information of a property's value. However, they argue there was no such sale of the properties here because the April 2003 sale of the mining company was neither recent nor of "the property" at issue.[6] The property conveyed by the

---

[6] Because we conclude that the sale of the mineral company was not a sale of "the property" we need not reach the Tribes' assertion that the sale was not recent.

April 2003 sale was a mining company that included over 5,700 acres of real estate, mining equipment, residential property, goodwill, and intangible interests in scientific research. However, the two forty-acre parcels here were merely one component of that sale.

¶ 12.  Moreover, the Tribes argue recent material changes have significantly altered the value of the parcels. At the time of the sale, the parcels were part of a mining company. However, the Tribes offered evidence the two parcels no longer have any value as mining property. Not only do restrictive covenants now forbid mining on the land, they assert, but any mining project would require several thousand acres of adjacent land—land the Tribes sold after purchasing the mineral company. In addition, they contend it is highly speculative the State and the United States Army Corps of Engineers would issue the necessary permits even were an applicant to renew the applications.[7] They observe that for two decades well-funded, international corporations had been unable to obtain permits. Because of these factors, the Tribes' expert concluded it was "highly unlikely that the ore body . . . will be extracted in the reasonably foreseeable future through a mining operation using presently known mining methods and technology."

---

[7] The Tribes' expert suggested that the difficulty such companies faced attempting to obtain these permits underscores the unlikelihood the parcels could have been developed as a mining site. He quotes the mineral company's project manager, Gordon Connor, Jr., as telling the Milwaukee Sentinel Journal in October 2003 that before Resources Group sold the mineral company to the Tribes, the company "searched throughout the world for venture capitalists or mining partners, none wanted anything to do with a metallic mining project in Wisconsin."

¶ 13. These factors are appropriate consider-
ations in valuing the property, the Tribes argue, be-
cause they show mining is not the highest and best use
of the land. Many factors, they assert, contribute to
determining the highest and best use of a property in
Wisconsin. Among other things, the use must be legal,
in balance with the uses of property around it, and not
highly speculative. Further, the highest and best use
can change over time. 1 ASSESSMENT MANUAL, *supra,* at
7–9, 7–10. The Tribes contend that mining of the
parcels is not presently legal or in balance with the
surrounding land. Moreover, they argue it is highly
speculative that the necessary permits would be issued.
Even if permits were issued, they continue, it is still
speculative that any gains from extracting the mineral
core would outweigh the costs of mining the property.
They therefore contend there is no basis for assessing
the Crandon parcels at a value over nine times that of
other forested land in northern Wisconsin.

¶ 14. The Town responds, without elaboration,
that the April 2003 sale was a recent arm's-length sale
and that it was therefore unnecessary to look at other
factors affecting the properties' value.[8] Even if this sale
did not end inquiry into the properties' value, the Town

---

[8] The Town strains its credibility by relying extensively on
a quotation from an unpublished certification to the Wisconsin
Supreme Court and attributing the quotation to a published
supreme court decision. As the Town is no doubt aware, WIS.
STAT. RULE 809.23(3) provides that unpublished dispositions are
"of no precedential value and for this reason may not be cited in
any court of this state as precedent or authority, except to
support a claim of claim preclusion, issue preclusion, or the law
of the case." In addition, we have previously noted that argu-
ments not supported by accurate citations to legal authority do
not comply with WIS. STAT. RULE 809.19(1)(e), and that this

argues the factors the Tribes raised are not legally permissible considerations. The Town discounts the changes in the property preventing mine development, terming them "self-imposed restrictions," which it concludes are not proper considerations in assessing property value. That a mine might not be developed in the near future is irrelevant, asserts the Town, because the potential to mine the mineral core is still an integral component of the land's value.

¶ 15. The circuit court agreed with the Town that the assessments were based on a recent arm's-length sale of the property, and that the law precluded consideration of the other factors advanced by the Tribes. The court characterized the Tribes' position as essentially that "the parcels in question must be assessed . . . as if the ore deposit did not exist at all." In the court's view, then, the summary judgment hearing pitted the well-accepted deference accorded to recent arm's-length sales against the notion that a property-owner's intended use of property trumps the sales price as the best benchmark of a property's value. Accordingly, it concluded, "the method [the Town] used is in my opinion not . . . just the preferred method, it's the mandatory method. You don't get by number one if there's a recent arm's-length sale."

¶ 16. However, to properly rely on a recent arm's-length sale, the sale must be of "the property." *Markarian*, 45 Wis. 2d at 686. Here, that was not the case. A value derived by analyzing a complex corporate transaction involving the sale of a variety of assets—tangible and intangible, independent and interdependent—is

court may refuse to consider such arguments. *State v. Shaffer*, 96 Wis. 2d 531, 545–46, 292 N.W.2d 370 (Ct. App. 1980).

not equivalent to the price obtained in a sale of one component of that transaction.

¶ 17.  We have long recognized that the rationale for looking at actual sales is to eliminate the possibility for error inherent in using human judgment to determine what a seller could expect to receive from a sale of property.

> [A]ctual sales of like or similar property . . . in as large a measure as possible eliminate[es] the mere judgment of the assessor . . . enabling an owner or the assessor . . . to prove the valuation by facts which he has had no part in establishing or shaping and which do not lie solely in any man's judgment.

*State ex rel. Northwestern Mut. Life Ins. Co. v. Weiher*, 177 Wis. 445, 448–49, 188 N.W. 598 (1922). Thus, looking at what a given property recently fetched in an open-market sale eliminates any guesswork or extrapolation. Knowing what a property *actually* sold for obviates inquiry into what it *might* sell for.

¶ 18.  Here, Sanders of the Department of Revenue used his judgment to allocate what he believed was the portion of the April 2003 sale attributable to taxable land in the Town. That his judgment was integral to his analysis of the sales data is evident from the circuit court's observation:

> I don't know how many people like that the State of Wisconsin employs and I don't know whether other states have any people as capable as he seems to be based on his knowledge of land values, his ability to analyze complicated transactions, and to extrapolate a value of two 40–acre parcels and pull it out of a larger transaction.

Childers, the Town's assessor, then used his own judgment when he treated the amount of the sale Sanders

374

had allocated to land in the Town as the "sales price" of these properties. Both Sanders and Childers used their judgment to determine a sales price for the Crandon parcels. As a result, the sale did not "prove [the parcels'] valuation by facts which [the assessor] ha[d] no part in establishing or shaping." *Weiher*, 177 Wis. at 449.

¶ 19. Because the Town's assessment was not based on a recent arm's-length sale of the properties as it claimed it was, the Tribes have shown significant contrary evidence rebutting the presumption in favor of the Town's assessment. *See State ex rel. Park Plaza Shopping Ctr., Inc. v. Board of Review*, 61 Wis. 2d 469, 475, 213 N.W.2d 27 (1973) (on certiorari review, if assessor has based value on false assumption, assessment must be set aside). Thus, the circuit court incorrectly disregarded other evidence of the land's value.

¶ 20. The Tribes presented evidence that mining is not the highest and best use of the properties, that the mineral core adds little value to the land, and that the properties were assessed at a much higher level than reasonably comparable properties. These issues present questions of fact. Therefore, the circuit court erred by granting summary judgment in favor of the Town.

*By the Court.*—Judgment reversed and cause remanded for further proceedings.