DUGAN, J.
*186 ¶1 Marathon Petroleum Company LP and U.S. Venture, Inc. (collectively the "Oil Companies") appeal the trial court's order affirming the City of Milwaukee's 2008 through 2014 property tax assessments for their oil terminals.
¶2 On appeal, the Oil Companies argue that the trial court erred as a matter of law in affirming the City's 2008 through 2014 property tax assessments for their oil terminals because that valuation included non-assessable intangible value. However, we hold that the income-generating capability of the oil terminals "appertains to" and is "inextricably intertwined" with the land and is thus transferable to future purchasers of the land (the "inextricably intertwined test").[1] Therefore, this income may be included in the land's assessment because it appertains to the land.
*187 ¶3 Moreover, based on our independent review of the record, we uphold the trial court's determination that the Oil Companies failed to introduce significant contrary evidence to overcome the statutory presumption of correctness attached to the City's assessment. Specifically, the Oil Companies' expert failed to apply the inextricably intertwined test and, therefore, he did not properly apply WIS. STAT. § 70.32(1) (2009-10)[2] and the Property Assessment Manual , as required by Wisconsin law. Further, we uphold the trial court's finding that the Oil Companies' expert's *121 appraisal report and testimony was not credible.
¶4 The following background, which relies primarily on the trial court's findings of fact, provides helpful context for the issues in this case. Additional facts are included in our analysis as needed.
BACKGROUND
¶5 Granville Terminal Complex, located in the City, is the site of five oil terminals (the "Granville terminals"). The five Granville terminals are comparable properties to each other.[3] The Oil Companies are two of the Granville terminals' owners.
¶6 The City's initial tax assessments of the Granville terminals for the years 2008 through 2014 were determined using mass appraisal techniques, as *188 permitted under Wisconsin law.[4] At the time of those assessments, Peter Weissenfluh was the City's chief assessor and was responsible for the assessments of the Granville terminals.
¶7 The City assessed the Oil Companies' terminals for the years 2008 through 2014 as follows:
Year Marathon U.S. Venture Assessment Per-Barrel Assessment Per-Barrel 2008 $16,733,000 $34.89 $20,251,000 $34.89 2009 $16,733,000 $34.81 $20,231,000 $34.81 2010 $16,733,000 $34.33 $20,231,000 $34.33 2011 $17,434,000 $34.49 $22,672,000 $34.12 2012 $17,434,000 $34.49 $22,672,000 $33.81 2013 $17,434,000 $34.49 $22,672,000 $34.45 2014 $17,434,000 $34.49 $22,672,000 $33.36
¶8 In 2009, pursuant to WIS. STAT. § 74.37(3)(d), the Oil Companies filed separate actions alleging that the assessments for their oil terminal properties for the years 2008 through 2014 were excessive pursuant to § 74.37(1) because they exceeded the properties' fair market value. The Oil Companies sought refunds of the excessive taxes paid on those properties, together with interest as provided by § 74.37(5).[5]
*189 ¶9 Based upon the differences between the City and the Oil Companies' valuations for those eight years, Marathon sought a total tax refund of roughly $1.7 million plus statutory interest, and U.S. Venture sought a total tax refund of roughly $1.4 million plus statutory interest. In November 2015, the trial court presided over a two-week bench trial.
¶10 At trial, the City relied upon valuations co-authored by its retained experts Weissenfluh and James Watson. The Oil Companies relied upon valuations by their expert Kevin Reilly. The City and the Oil *122 Companies' respective valuations are shown in the chart below:
City and Oil Companies' Expert Valuations Year City Oil Companies City Oil Companies Marathon Marathon U.S. Venture U.S. Venture 2008 $17,704,909 $9,300,000 $23,915,921 $15,100,000 2009 $17,663,894 $8,700,000 $23,860,518 $15,200,000 2010 $17,418,411 $8,000,000 $23,528,917 $13,100,000 2011 $17,500,000 $8,400,000 $23,386,803 $13,300,000 2012 $17,500,000 $9,000,000 $23,173,631 $14,700,000 2013 $17,500,000 $8,000,000 $22,925,700 $15,200,000 2014 $17,500,000 $8,000,000 $22,865,715 $14,900,000
¶11 The trial court found that Weissenfluh and Watson's methodology and opinions are in conformity with Wisconsin law and the Wisconsin Property Assessment Manual for Wisconsin Assessors (the "Property Assessment Manual "). The trial court found that Reilly's appraisal report and testimony were not credible and therefore did not and could not constitute significant contrary evidence.
*190 ¶12 The City determined that none of the Oil Companies' Granville terminals had been recently sold. Therefore, it was not possible to do a Tier 1 Recent Sale (Tier 1) analysis to determine value. Accordingly, the City relied upon a Tier 2 Comparable Sales (Tier 2) analysis to support each year's assessment. It primarily used these three Granville terminal sales: the Exxon terminal that sold in 2007, the Flint Hills terminal that sold in 2010 and the BP terminal that sold in 2011. Further, as checks on its Tier 2 analysis of the three Granville oil terminal sales, the City did a Tier 2 analysis of the sales of thirteen additional oil terminals within the Midwest, and did a Tier 3 Income and Cost analysis.
¶13 The trial court found that the City's approach "fully support[ed]" its property assessments for each of the challenged years. Each of the sales provided Tier 2 market support for the assessments of the subject properties. The trial court found that (1) the City verified, analyzed and adjusted all of the sales in conformity with the Property Assessment Manual and Wisconsin statutes, (2) the real estate sales included all the rights, benefits and privileges appertaining to the real estate, and (3) the sales in the City's appraisal reflected the economic climate and market for oil terminals during the years at issue.
¶14 The trial court found that the City's assessments took into consideration the income-generating capability of the real estate that was inextricably intertwined with the land and transferrable to future owners and did not consider the individual contracts associated with each property or the skill or management of the individual operators. Thus, the trial court determined that the City's conclusions in the Tier 2 *191 approach provided "a credible valuation upon which the court could rely to find that the assessments are not excessive."
¶15 The trial court also found that the Tier 3 Income and Cost approach relied upon by the City, as a check on the value conclusions reached under the Tier 2 approach, confirmed that the City's tax assessment of the Oil Companies' terminals was not excessive. Facts relevant to the City's Tier 3 Income and Cost approaches *123 will be set forth in the body of this decision.
¶16 Moreover, the trial court found that the Oil Companies had not presented "[s]ignificant contrary evidence rebutting the presumption of fair and equitable assessment." The trial court also made the following findings regarding the Oil Companies' expert, Reilly: (1) he failed to rely upon a sales comparison analysis when there were sales of comparable properties available and, therefore, had failed to comply with WIS. STAT. § 70.32(1) ; (2) he failed to take into consideration all of the real estate business value that appertains to the real estate; (3) because he disavowed the Tier 2 comparable sales analysis, his opinions and testimony were not credible; and (4) his sales comparison analysis was not credible because he primarily relied on a property that was not comparable. Additionally, the trial court noted that in responding to its questions Reilly stated that, if the income-generating capability of the property was included in the value of the real estate, the value of the oil terminals would be higher than his assessed value.
¶17 This appeal followed.
*192 DISCUSSION
¶18 We begin our discussion by setting forth the legal standards governing real property assessment and our review of the issues presented.
I. Standards for Real Property Assessment
¶19 The standards for real property assessment begin with WIS. STAT. § 70.32(1) which provides, in pertinent part, as follows:
Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under s. 73.03(2a) ... at the full value which could ordinarily be obtained therefor at private sale. In determining the value, the assessor shall consider recent arm's-length sales of the property to be assessed[;] ... recent arm's-length sales of reasonably comparable property; and all factors that, according to professionally acceptable appraisal practices, affect the value of the property to be assessed.
Id. This statute requires adherence to the Property Assessment Manual , absent conflicting law. See Walgreen Co. v. City of Madison , 2008 WI 80, ¶ 3, 311 Wis. 2d 158, 752 N.W.2d 687. Thus, we analyze the applicable statutes "in conjunction with basic principles of real property assessment as described by case law, treatises, and the Property Assessment Manual ." Id. , ¶ 19.
¶20 "The Property Assessment Manual and case law set forth a three-tier assessment methodology to ascertain [a real property's] true cash value." See *193 Adams Outdoor Advert., Ltd. v. City of Madison , 2006 WI 104, ¶ 34, 294 Wis. 2d 441, 717 N.W.2d 803. "True cash value" is synonymous with "fair market value," which is the price that the real property would sell for "upon arm[']s-length negotiation in the open market, between an owner willing but not obligated to sell, and a buyer willing but not obligated to buy." See id. , ¶ 33 n.8 (citation and one set of quotation marks omitted).
¶21 With respect to the three-tier assessment methodology, Adams Outdoor explains,
Evidence of an arm[']s-length sale of the subject property is the best evidence of true cash value [Tier 1]. If there has been no recent sale of the subject property, an assessor must consider sales of reasonably comparable properties [Tier 2]. Only if there has been no arm[']s-length sale and there are no reasonably comparable sales may an assessor use *124 any of the third-tier assessment methodologies [Tier 3].
Id. , 294 Wis. 2d 441, ¶ 34, 717 N.W.2d 803 (citations omitted; brackets added). See also , State ex rel. Markarian v. City of Cudahy , 45 Wis. 2d 683, 686, 173 N.W.2d 627 (1970).
II. The Standard of Review for Excessive Tax Assessment Actions under WIS. STAT. § 74.37(3)(d)
¶22 A party that is dissatisfied with an assessment may bring an excessive tax assessment claim under WIS. STAT. § 74.37(3)(d). See Bloomer Hous. Ltd. P'ship v. City of Bloomer , 2002 WI App 252, ¶ 11, 257 Wis. 2d 883, 653 N.W.2d 309. Acting pursuant to § 74.37(3)(d), the trial court makes determinations concerning excessive tax assessment claims "without giving deference to any determination made at a previous proceeding," including any proceeding before *194 the board of review. See Nankin v. Village of Shorewood , 2001 WI 92, ¶¶ 24-25, 245 Wis. 2d 86, 630 N.W.2d 141.
¶23 "The court must only give presumptive weight to the assessor's assessment." Id. , ¶ 25 (citing WIS. STAT. § 70.49(2) ). However, "[t]he assessor's assessment 'is presumed correct only if the challenging party does not present significant contrary evidence.' " Allright Props., Inc. v. City of Milwaukee , 2009 WI App 46, ¶ 12, 317 Wis. 2d 228, 767 N.W.2d 567 (citations and some quotation marks omitted).
¶24 "An opinion as to value which ignores the statutory factors is not 'significant contrary evidence' necessary to overcome the presumption that the assessment is valid." Great Lakes Quick Lube, LP v. City of Milwaukee , 2011 WI App 7, ¶ 18, 331 Wis. 2d 137, 794 N.W.2d 510. In other words, "when the city assessor correctly applies the Property Assessment Manual and Wisconsin statutes, and there is no significant evidence to the contrary, courts will reject a party's challenge to the assessment." See Allright Props. , 317 Wis. 2d 228, ¶ 12, 767 N.W.2d 567.
¶25 On appeal, we defer to the trial court's findings of fact. See Adams Outdoor , 294 Wis. 2d 441, ¶ 27, 717 N.W.2d 803 ("Where there is conflicting testimony the fact finder is the ultimate arbiter of credibility."). "The weight and credibility to be given to the opinions of expert witnesses is 'uniquely within the province of the [trial court].' " Id. (citation and one set of quotation marks omitted). "We will not upset [a trial] court's factual findings, including findings involving the credibility *195 of witnesses, unless they are clearly erroneous." Bonstores Realty One, LLC v. City of Wauwatosa , 2013 WI App 131, ¶ 6, 351 Wis. 2d 439, 839 N.W.2d 893. However, "[a]pplication of the law to the facts presents a question of law that we review de novo ." See id.
III. The Income-Generating Capability of Real Estate that is Inextricably Intertwined with the Land may be Included in the Real Estate's Assessment
¶26 The crux of the Oil Companies' argument is that the City's assessments of their Granville terminals improperly includes non-assessable intangible value in the form of business value found in terminalling agreements. Therefore, we first address whether the value of the income-generating capability of the oil terminals, partially represented by terminalling agreements, adheres to the real property as a right or privilege appertaining to the real estate, as argued by the City, or whether that value is a separate non-assessable intangible property, as argued by *125 the Oil Companies. Then we address the Oil Companies' other arguments.
A. The Inextricably Intertwined Test
¶27 Our discussion of the inextricably intertwined test begins with consideration of the statutory basis for tax assessments. WISCONSIN STAT. § 70.01 provides that "[t]axes shall be levied, under this chapter, upon all general property in this state except property that is exempt from taxation. WISCONSIN STAT. § 70.03 defines "real property," "real estate," and "land" for the purpose of tax assessment as "not only the land itself but all buildings and improvements *196 thereon, and all fixtures and rights and privileges appertaining thereto ...." (Emphasis added.)
¶28 Our supreme court has explained that "[w]hether an income interest may be captured in a property assessment hinges on whether the value appertains to the property. A value that appertains to property is one that is transferable with the property." ABKA Ltd. v. Board of Review of the Vill. of Fontana-On-Geneva Lake , 231 Wis. 2d 328, 336, 603 N.W.2d 217 (1999). See also State ex rel. N/S Assocs. v. Board of Review of the Vill. of Greendale , 164 Wis. 2d 31, 53-55, 473 N.W.2d 554 (Ct. App. 1991). The ABKA Ltd. court went on to state that,
A determination of whether business value is assessable involves an inquiry into the income-producing capacity of the land. Income that is attributable to the land , rather than personal to the owner, is inextricably intertwined with the land and is thus transferable to future purchasers of the land. N/S Assocs. , 164 Wis. 2d at 54 [473 N.W.2d 554]. This income may then be included in the land's assessment under WIS. STAT. § 70.03 because it appertains to the land.
ABKA Ltd. , 231 Wis. 2d at 336, 603 N.W.2d 217 (emphasis added).
¶29 In N/S Associates , this court found as follows:
[the mall's] raison d'etre [sole reason for existence]-namely, the leasing of space to tenants and related activities such as trash disposal, baby stroller rentals, etc.-is a transferrable value that is inextricably intertwined with the land and "all buildings and improvements thereon, and all fixtures and rights and privileges appertaining thereto," [ WIS. STAT. ] § 70.03, just as the transferrable value of a farm-the growing of crops-is inextricably intertwined with the property from which the farm operates.
*197 See N/S Assocs. , 164 Wis. 2d at 55, 473 N.W.2d 554. The court then held that "[i]n light of Wisconsin's pre-eminent focus on what property will bring in an arm's-length sale as the basis of value, tax assessment under [ WIS. STAT. ] § 70.32(1) may include as a component of value the property's transferable income-producing capability that is reflected by a recent sale." See N/S Assocs. , 164 Wis. 2d at 55, 473 N.W.2d 554.
¶30 Other Wisconsin cases have applied the inextricably intertwined test to determine whether the income-generating capability of property can be properly included in the tax assessment for the property. In Allright Properties , this court applied the inextricably intertwined test to a surface commercial parking lot and held that the income generated by the parking lot appertained to the land and was properly considered in the property's assessment. See Allright Props. , 317 Wis. 2d 228, ¶ 47, 767 N.W.2d 567. We explained that "Allright operates a surface parking lot in a location that will obviously continue to attract customers as long as the airport operates. Operation of the parking lot 'is a transferable value that is inextricably intertwined with the land and "all buildings and improvements thereon." ' " See *126 id ., ¶ 46 (citation and one set of quotation marks omitted).
¶31 The Allright court also summarized the inextricably intertwined test's application in other factual settings, stating,
These rights appertaining to the land have been held to include the income generated from renting spaces in a shopping mall, see N/S Assocs. , 164 Wis. 2d at 55 [473 N.W.2d 554] ; the potential for income from management of the rental of condo units in a resort located on the property, see ABKA , 231 Wis. 2d at 331 [603 N.W.2d 217] ; and the income generated from operation of a landfill on property, see *198 Waste Mgmt. of Wis., Inc. v. Kenosha County Bd. of Review , 184 Wis. 2d 541, 545, 516 N.W.2d 695 (1994).
See Allright , 317 Wis. 2d 228, ¶ 41, 767 N.W.2d 567. As shown by the foregoing cases, the concept that income-generating capability of property can be inextricably intertwined with the land and appertained to the property is well developed in Wisconsin case law.
¶32 We next address whether the inextricably intertwined test applies to Tier 2 analysis.
B. The Inextricably Intertwined Test Applies to Tier 2 Analysis
¶33 Citing Walgreen , 311 Wis. 2d at 158, 752 N.W.2d 687, the Oil Companies argue that the trial court improperly expanded the inextricably intertwined test because Walgreen holds that it is inappropriate to apply the inextricably intertwined test from a Tier 3 Income approach to a Tier 2 approach. However, Walgreen does not state that the inextricably intertwined test applies only in a Tier 3 Income approach for determining value. Moreover, in N/S Associates , this court defined and applied the inextricably intertwined test in a Tier 1 analysis based on a recent sale of the subject property.
¶34 The Oil Companies do not develop or support their argument. They merely assert that the inextricably intertwined test applies only in a Tier 3 Income approach. We do not depart from our role as the neutral resolvers of disputes to develop arguments for parties. See Clear Channel Outdoor, Inc. v. City of Milwaukee , 2017 WI App 15, ¶ 28, 374 Wis. 2d 348, 893 N.W.2d 24.
*199 ¶35 The Oil Companies merely cite Forest County Potawatomi Community v. Township of Lincoln and argue that the sale of oil terminals involves complex corporate business transactions that include intangible value that cannot be considered for tax assessment purposes. They cite the following excerpt from Forest County Potawatomi which states that,
to properly rely on a recent arm's-length sale, the sale must be of "the property." Here, that was not the case. A value derived by analyzing a complex corporate transaction involving the sale of a variety of assets-tangible and intangible, independent and interdependent-is not equivalent to the price obtained in a sale of one component of that transaction.
Id. , 2008 WI App 156, ¶ 16, 314 Wis. 2d 363, 761 N.W.2d 31 (citation omitted). They argue that, like the sale in Forest County Potawatomi , sales of oil terminals involve complex corporate transactions that include intangible value that cannot be considered for tax assessment purposes. Based on the language in Forest CountyPotawatomi , they argue that it was improper for the City to use Tier 2 analysis in assessing the oil terminals.
¶36 However, the facts in Forest County Potawatomi are distinguishable. There this court pointed out that the sale that the Township had treated as a recent sale of the property was actually the sale of the mining company, not just the real estate.
id="p127" href="#p127" data-label="127" data-citation-index="1" class="page-label">*127See id. , ¶ 3. Moreover, the court noted that "neither party argue[d] that th[e] purchase should be considered a recent arm's-length sale of the properties." See id. , ¶ 3 n.2. Additionally, the court concluded "the sale of the mining company included not just the two forty-acre parcels but also substantial other land and company assets." See id. , ¶ 2.
*200 ¶37 Most significantly, whether the income-generating capability of the land was inextricably intertwined with that land was never an issue in Forest County Potawatomi . This court did not cite or discuss the application of case law addressing whether the income-generating capability of land can be inextricably intertwined with the land in that case.
¶38 Moreover, as noted, the N/S Associates court specifically applied the inextricably intertwined test to a recent sale of a mall. The Oil Companies have not articulated a rational explanation why it is appropriate to use the inextricably intertwined test in a Tier 1 analysis involving a sale, but it is not appropriate to use the test in a Tier 2 analysis involving comparable sales. Therefore, we reject the Oil Companies' argument that the inextricably intertwined test applies only to a Tier 3 Income approach analysis and hold that the inextricably intertwined test also applies to a Tier 2 analysis for valuing real property for tax assessment purposes. We hold that this case is governed by the cases cited in our discussion of the inextricably intertwined test, particularly ABKA Ltd . and N/S Associates , not Forest County Potawatomi .
¶39 We next address whether the income-generating capability of the oil terminals is inextricably intertwined with the land.
C. The Income-Generating Capability of the Oil Terminals is Inextricably Intertwined with the Land
¶40 The Oil Companies argue that the sale of oil terminals involves a complex corporate transaction and the sales price often includes the value of business *201 contracts, including throughput agreements, which are separate from the value of the real estate sold. We hold that the throughput agreements are not separate intangible business contracts. They represent income that is attributed to the land, rather than personal to the owner. They are inextricably intertwined with the land and, thus, transferrable to future purchasers of the land.
The Trial Court's Summary
¶41 In this case, the trial court made detailed findings of fact and conclusions of law. It concluded that this case was "indistinguishable from ABKA, Ltd. ...and, to only a slightly lesser extent, N/S Assocs. , Allright Properties , and Waste Management ." (Citations omitted.) Addressing the income-generating capability of the oil terminals, the trial court stated,
Much like the reason for existence of the mall in the [ N/S Associates ] case was the production of income through the rental of retail space, [ N/S Associates , 164 Wis. 2d at] 55 [473 N.W.2d 554], the reason for existence of these properties [oil terminals] is the production of income through storage and processing fees for petroleum products. That income producing value-the "expectation of income[,]" ... is, without question, a primary source of real estate value of these properties.
(Citation omitted.) It concluded that, "However, the 'income producing capacity' inheres in the properties; transfers upon sale, and[ ] is properly included in the assessed value."
*128 ¶42 The trial court's summary accurately reflects the application of the inextricably intertwined test to the oil terminals.
*202 The Testimony of the City's Experts Supports the Conclusion that the Inextricably Intertwined Test Applies to the Oil Terminals
¶43 The purpose of the Granville terminals is to temporarily store petroleum products for the end user. This storage process for gasoline or diesel product at the Granville terminals includes (1) receiving the product via an underground pipeline entering into the Granville location, (2) storing the product in one of the location's multiple storage tanks, (3) moving the product from the storage tanks via underground pipes to the bulk truck loading area,[6] (4) blending the product with ethanol and other additives stored in separate tanks, and (5) the loading of the product by the customer into the customer's fuel truck for delivery to a gas station or other destination.
¶44 Pipeline access is critical to the terminal business. The only available way to transport gasoline products into the Milwaukee market, which serves all of southeastern Wisconsin, is the underground pipeline located in Granville. The revenue earned at the Granville terminals cannot be earned elsewhere in the state. The other two major Wisconsin terminal locations in Green Bay and Madison cannot service the Milwaukee market because their terminals are not equipped to distribute reformulated gas, which is only a legal requirement for southeastern Wisconsin.
¶45 Dr. Thomas W. Hamilton, Ph.D., an expert in generally accepted appraisal practices, testified pertaining to the concept of inextricably intertwined real property. He described the terminal business as a *203 liquid storage warehouse and the income generated the equivalent of rent. He explained that, for example, the terminals are no different than a dry goods storage facility located on California's shores-those storage facilities receive goods coming into the country and the shoreline location is critical to that business. Similarly, the location at the pipeline is critical to the oil terminal business. He further stated that the terminals operate as a real estate business.
¶46 Hamilton also testified that when an oil terminal is sold, the potential revenue stream does not end-it continues with the new owner. "The potential is caused by the marketplace. If there's still demand out there for people to put gasoline in their cars, they need to get it from somewhere."[7] "And the only way to make that income occur is to flow [product] through that property." Because the oil terminals are real estate assets that produce real estate income, the terminalling agreements (in effect, leases) have no independent value apart from the real property. Hamilton explained that as long as the terminalling agreements contain market rates, they have no additional value above and beyond the value of the real estate's inherent ability to generate income.[8]
¶47 Watson, the City's other expert, agreed with Hamilton that the terminalling agreements merely represent the income-generating capability of the real property-the *129 oil terminals. That value is inextricably intertwined with the real estate and is not separate and independent. In response to the question, *204 "[i]n your opinion, are these [t]hroughput [a]greements similar to a lease for real estate," he answered:
I think there are a lot of similarities between them. They're not called a lease, they're called a [t]hroughput [a]greement or [t]erminalling [a]greement. But, in my opinion, there's a lot of the same characteristics here where one party is basically reserving space for a designated fee for a designated term.
¶48 Thus, we conclude that the testimony of the City's experts supports the application of the inextricably intertwined test to the oil terminals.
The Oil Companies' Additional Arguments are not Persuasive
¶49 The Oil Companies present two additional arguments in further contending that the value attributable to business contracts should be excluded from the assessed value of the oil terminals. They assert that Weissenfluh admitted that the value attributable to "business contracts"[9] should be excluded from the total sales price for real estate assessment purposes. They also maintain that the sales of the oil terminals involved other intangible value separate from the land's income-generating capability.
¶50 The argument, premised on Weissenfluh's testimony, lacks support in the record. Weissenfluh testified, "I believe it's wrong to include intangible value of property within the sale price," and "[m]y understanding is that intangible assets are not taxable under Wisconsin law, but it's only the real property." When Weissenfluh was asked whether, if the parties *205 assigned a discrete value to a throughput contract, he would exclude that value from the sale price for real estate, Weissenfluh said he would have to take a look at the agreement itself and make a decision. Such testimony is consistent with Weissenfluh's testimony about throughput contracts, as discussed in this decision regarding the inextricably intertwined test. In that regard, both Weissenfluh and Hamilton stated that throughput agreements, which are at market value, have no independent value from the real estate and are not an intangible item.
¶51 The Oil Companies also argue that the City did not prove that value attributable to these "business contracts" is incapable of being separated from the value of the underlying terminal. However, it is the Oil Companies who must overcome the presumption that the assessment is correct by presenting significant contrary evidence. See Allright Props., Inc. , 317 Wis. 2d 228, ¶ 12, 767 N.W.2d 567. The Oil Companies assert that their expert, Reilly, confirmed that the publicly-available information about comparable terminal sales and the corresponding transaction prices was not reliable, meaningful or consistent enough for any assessor or valuation expert to fairly appraise the terminals using the Tier 2 approach. However, Reilly merely opined that the sales of oil terminals are complex corporate transactions involving much information that is confidential to the seller and buyer and not available to the public. He stated that every sale of an oil terminal "includes the real estate as well as potentially some intangible assets and would be more of a business sale of the business." (Emphasis added.) When asked what the nature of those intangibles are, he testified "There may be forms of contracts, there could be labor workforce;
*206 oftentimes, drawings, operating *130 manuals, procedures are sold with terminals. Typical business intangibles." (Emphasis added.)
¶52 Basically, Reilly's testimony boiled down to, based on his experience, he knows that there are intangible assets in the sale of every oil terminal, but he cannot identify them. In other words, it is true because he says so-ipse dixit -even though he cannot prove it. The trial court found Reilly's opinions were not credible, and the trial court is the ultimate arbiter of credibility. See Adams Outdoor , 294 Wis. 2d 441, ¶ 27, 717 N.W.2d 803. Thus the Oil Companies failed to introduce any significant evidence that it is possible to separate out the real estate and any business value of the sale of the comparable oil terminals used in the Tier 2 analysis.
¶53 Moreover, we agree with the trial court where it noted, the assessor must value real property "from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale," citing WIS. STAT. § 70.32(1). The trial court also stated that under the statute "the assessor does not have to have perfect information[,] when setting an assessment, only ... the best information practically available." (Bolding omitted.) It then held "[t]he City assessor set the assessments using the best information practically available and did so in compliance with Wisconsin statutes and the ... Property Assessment Manual ."
¶54 Next, the Oil Companies assert that the City did not prove that the sales price of the comparable oil terminals was not the result of any business acumen or skill of the owners of the terminals. However, we emphasize that "[t]he assessor's assessment is 'presumed correct only if the challenging party does *207 not present significant contrary evidence.' " Allright Props., Inc. , 317 Wis. 2d 228, ¶ 12, 767 N.W.2d 567 (emphasis added; citations and some quotation marks omitted). The Oil Companies do not offer any facts in the record that would show the owners of the terminals possessed any special business acumen or skill in operating the terminals. In fact, there is no evidence in the record regarding the oil terminals management or any special skills necessary to reproduce the income stream of the oil terminals. In ABKA , the court noted that "[a] competent level of management can be expected to reproduce the predicted income stream from the condominiums." See id ., 231 Wis. 2d at 342, 603 N.W.2d 217. Here, a competent level of management can be expected to reproduce the predicted income stream from the oil terminals. Moreover, the trial court specifically found that "each of the subject properties is assessed based upon its capacity to produce and not the skill or management of the individual operators." This finding is not clearly erroneous and will not be disturbed.
¶55 Applying the inextricably intertwined test to the facts adduced from the testimony of experts Hamilton and Watson, the trial court found that "[t]he income producing capacity of these properties-partially established by the throughput contracts and other best information practicably available to the City-is assessable value appropriately captured in the City's Tier [2] valuation." It explained that the throughput agreements merely constituted evidence of the income-generating capability of the oil terminals.
¶56 The trial court's findings are not clearly erroneous and we accept them. Furthermore, having independently considered the questions of law, we concur with the trial court's conclusions. The income-generating capability of the oil terminals through the *208 storage and processing of petroleum products at the Granville terminals *131 appertains to the real estate. That income may then properly be included in the land's assessment under WIS. STAT. § 70.03 because it appertains to the land.
¶57 We reject the Oil Companies' argument that terminalling agreements constitute intangible value for the purposes of tax assessment. We hold that terminalling agreements are part of the income-generating capability of the land and are inextricably intertwined with the land. Therefore, the income generated by the terminalling agreements may be included in the land's assessment.
IV. The City Properly Applied the Tier 2 Approach in Valuing the Oil Terminals
A. The City Properly Analyzed the Granville Oil Terminal Sales
¶58 The City primarily relied on the sales of three Granville terminal sales. The Granville comparable sales include the following:
Terminal Owner Sale Year Transfer Tax Sale Price Per-Barrel Return Value of Capability Exxon-50% 2007 $8,000,000 $35.32 interest sold Flint Hills 2010 $11,584,788 $39.17 BP 2011 $16,464,364 $33.31
The Oil Companies do not dispute the trial court's finding that the three Granville oil terminals are *209 comparable properties. They challenge the City's Tier 2 analysis asserting that the City (1) improperly applied the inextricably intertwined test that is only applicable to a Tier 3 Income analysis to a Tier 2 analysis, (2) improperly relied on the Tier 2 analysis because it included non-real estate value reflected in business contracts; and (3) improperly relied on the Wisconsin Real Estate Transfer Returns as setting the definitive value of the property for tax assessment.
¶59 We have already considered and rejected the Oil Companies' first two arguments. We also reject the Oil Companies' arguments regarding the Real Estate Transfer Returns because the Oil Companies misconstrue the City's argument.
¶60 As the trial court explained, "[t]he State of Wisconsin requires property owners to file a Wisconsin Real Estate Transfer Return upon the sale of real property. Wisconsin law requires the parties to that sale to sign the Real Estate Transfer Return, under penalties of perjury," citing WIS. STAT. §§ 77.22(1) and 77.27. The trial court found that for the three comparable Granville oil terminal sales, "[t]he real estate sale prices were reported on Wisconsin Real Estate Transfer Returns filed with the Wisconsin Department of Revenue, by the parties to the sales." Further, Weissenfluh testified that the Property Assessment Manual states that the assessor can rely on the Real Estate Transfer Return when valuing real property. Moreover, in Great Lakes , 331 Wis. 2d 137, ¶¶ 25-27, 794 N.W.2d 510, this court affirmed the trial court's conclusion that the City had properly assessed the subject properties where both the assessor and the trial court considered real estate transfer returns that had been filed at the time of the recent sales. Therefore, we hold that the *210 trial court properly considered the Real Estate Transfer Returns for the three Granville Terminals-it did not find *132 that the returns definitively established the value of the terminals for tax assessment purposes, it only considered them as a part of the overall evidence of the value of the real estate.
¶61 Using the information on the sales of the three comparable Granville Terminals, the City converted the value of each oil terminal into a value per-barrel by dividing the total value of the property by the terminal's total capability.[10] Thus the City determined that the sale price per-barrel of capability for the three comparable Granville terminals was (1) Exxon-$35.32 per-barrel in the 2007 sale, (2) Flint Hills-$39.17 per-barrel in the 2010 sale, and (3) BP-$33.31 per-barrel in the 2011 sale.
¶62 Then, the City determined the value of the Marathon and U.S. Venture terminals by calculating the average per-barrel sale price from the three comparable Granville terminals. The City then deducted three percent from that average, to remove any personal property value in the sale price, resulting in a $34.89 per-barrel price. Utilizing this information for the 2008 year for both Marathon and U.S. Venture, the City set the per-barrel assessment at $34.89 per-barrel resulting in a $16,733,000 assessed value for the Marathon property and a $20,251,000 assessed value for the U.S. Venture property based on each oil terminal's total capability.
*211 ¶63 We conclude, as did the trial court, that each of these Granville sales provided Tier 2 market support for the assessments of the subject properties.
B. As a Check on the Values for the Three Comparable Granville Oil Terminals the City Appropriately did a Tier 2 Analysis using Thirteen Other Oil Terminal Sales
¶64 Consistent with Great Lakes , as a further check to confirm that the three comparable Granville oil terminal sales were at market value, the City did a Tier 2 analysis of thirteen additional oil terminal sales. See id ., 331 Wis. 2d 137, ¶ 17, 794 N.W.2d 510. Watson, whose company had tracked sales of oil terminals for years and accumulated sales data for those terminals, provided a list of about 129 sales to the City. From that list, Watson and Weissenfluh selected sixteen Midwestern sales to be used in the Tier 2 analysis.[11]
¶65 Weissenfluh traveled 2000 miles to inspect ten of the thirteen sale properties outside of the Granville terminals. The City also searched the internet to obtain information in the public domain about the sales of these comparable properties. Additionally, the City talked with the assessors in the communities where the comparable oil terminals were located.
¶66 After determining the sales prices of the comparable oil terminals, the City made adjustments based on size differences, market conditions, time of sale, and location, and removed three percent of the sales price to account for personal property. The City then created a grid for the sixteen comparable sales *212 breaking the sales down into the three Granville properties, properties within one to 200 miles of the Granville terminals and properties within 200 to 400 miles from the Granville terminals. The chart below shows the per-barrel *133 sale price of the three Granville oil terminals compared to the sales prices of the comparable oil terminals within a 200- and 400-mile radius from the Granville properties.
Location (Number of Sales) Price Per-Barrel Granville, WI (3) $35.87 1-200 miles (8) $40.02 201-400 miles (5) $50.26
These thirteen sales confirmed that the three Granville oil terminals, valued at $35.87 per-barrel, sold at market value. Based upon this evidence, the trial court further held that:
The [c]ourt finds ... Weissenfluh's and ... Watson's appraisal report and testimony to be very credible and reliable. The sales contained in the City's sales grid are reasonably comparable properties to the Granville properties. Thus, the assessment was properly set using the Tier[ ]2 sales comparison approach, as demonstrated in the City's sales grid and pursuant to WIS. STAT. § 70.32(1).
The City's conclusions in the sales comparison approach provide a credible valuation upon which the [c]ourt can rely to find that the assessments are not excessive.
¶67 With respect to the sales of the thirteen additional oil terminals, the Oil Companies repeat the same arguments that they made regarding the sales of the three Granville oil terminals. We reject their *213 arguments for the same reasons we rejected the arguments regarding the three Granville oil terminals.
C. As a Check on the Values for the Three Comparable Granville Oil Terminals, the City Appropriately did a Tier 3 Analysis
¶68 As noted above, the Property Assessment Manual and case law set forth a third tier for determining a property's assessed value. See Adams Outdoor , 294 Wis. 2d 441, ¶ 34, 717 N.W.2d 803. Adams Outdoor explained:
Only if there has been no arm[']s-length sale and there are no reasonably comparable sales may an assessor use any of the third-tier assessment methodologies.
Id. (brackets and emphasis added; citations omitted). See also Markarian , 45 Wis. 2d at 686, 173 N.W.2d 627. When the assessor relies on comparable sales in a Tier 2 analysis, the assessor should not use a Tier 3 analysis except as a means to verify that the assessments were not excessive. See Great Lakes , 331 Wis. 2d 137, ¶¶ 18, 26-27, 794 N.W.2d 510. Here, the assessor correctly used a Tier 3 analysis merely as a means to verify that the assessments of the oil terminals were not excessive.
¶69 The trial court made the following findings regarding the City's Income approach valuation:
The income approach by the City is based upon actual income and expenses of the operators of the Granville oil terminals as a check on the value conclusions reached under the sales comparison approach.
Actual income and expense information of the subject properties was used to determine market rates *214 amongst the five Milwaukee oil terminals and then applied uniformly to each of the five properties.
The capitalization rate applied by the City in its income approach was calculated using market rates of peer companies that regularly buy oil terminal properties.
The income approach was performed by the City in accordance with the [Proper ty Assessment *134 ] Manual and the conclusions reached confirm that the assessments are not in excess of market value.
¶70 Addressing the Oil Companies' Tier 3 Income approach, the trial court found that Reilly's analysis contained significant errors, stating as follows:
The court finds that [Reilly] made significant errors in the calculations contained in his income approach to value. As explained by ... Watson at trial, as a result of mathematical and accounting errors and misapplication of the owners' historical financial statements, [Reilly] substantially understated income and significantly overstated expenses. This had the effect of significantly understating the value of the subject terminals via the income approach method of valuation.
¶71 The trial court also made the following findings regarding the City's Tier 3 Cost approach valuation:
The City performed a cost approach analysis as an additional check on the valuation determinations under the sales comparison approach.
The conclusions reached via the cost approach for each terminal demonstrate that the assessments are not excessive.
*215 ¶72 Addressing the Oil Companies' Cost approach analysis, the trial court found that Reilly's analysis was not credible, stating,
The [c]ourt finds [Reilly]'s cost approach to be not credible. [Reilly] failed to include an appropriate amount for soft costs in his cost calculations. The [three percent] [Reilly] included is inadequate to cover all of the indirect soft costs necessary to build a terminal. The court accepts [ ] Watson's testimony concerning soft costs. [Reilly's] cost approach also fails to include an appropriate amount for the correct type of piping and pumps designed to handle flammable products. The effect of [Reilly's] errors [is] a substantial understatement of the terminals calculated on the cost approach.
¶73 The Oil Companies do not challenge the methodology that the City used in analyzing the oil terminals under either the Income or Cost approaches. They argue that the only valid method of valuing the oil terminals is the Cost approach because it is the only methodology where the non-assessable value of business contracts is excluded. They assert that the resulting valuation excluded the value attributed to assets typically included in sales of oil terminals such as personal property, business contracts, inventory and other intangibles. This argument is a continuation of the Oil Companies' argument that the inextricably intertwined test does not apply when valuing oil terminals-an argument previously rejected in this decision.
¶74 Stated simply, we agree with the trial court that the City's Tier 3 Income and Cost approach analysis of the Oil Companies' Granville oil terminals *216 confirms that the City's tax assessments of those properties, appropriately based upon the Tier 2 analysis, are not excessive.
CONCLUSION
¶75 We hold that the income-generating capability of the oil terminals is inextricably intertwined with the land and is thus transferable to future purchasers of the land. Therefore, this income may be included in the land's assessment because it appertains to the land.
¶76 We affirm and hold as follows: (1) the inextricably intertwined test applies to the Tier 2 Comparable Sales approach for assessing real estate; (2) the Oil Companies' oil terminals have an income-generating capability that appertains to the real estate and, therefore, that capability may *135 be included in the real estate assessment; (3) the City properly applied the Tier 2 approach to determine the value of the Oil Companies' Granville terminals by using the sales of the three comparable Granville terminals; (4) the City also properly verified its Tier 2 analysis by using the sales of thirteen other comparable oil terminals and the Tier 3 Income and Cost approaches as a check to verify that its assessments of the Oil Companies' Granville terminals were not excessive; (5) because the Oil Companies' expert failed to apply the inextricably intertwined test in valuing the Oil Companies' Granville terminals, he failed to properly apply WIS. STAT. § 70.32(1) and the Property Assessment Manual ; and (6) we uphold the trial court's finding that the Oil Companies' expert was not credible in his appraisal report and his testimony.
¶77 Additionally, based on our independent review of the record, we affirm the trial court's determination *217 that the Oil Companies failed to introduce significant contrary evidence to overcome the statutory presumption of correctness attached to the City's assessment.
By the Court .-Order affirmed.

See Wis. Stat. § 70.03 and State ex rel. N/S Associates v. Board of Review of the Village of Greendale , 164 Wis. 2d 31, 53-55, 473 N.W.2d 554 (Ct. App. 1991) (setting forth the "inextricably intertwined" test).

All references to the Wisconsin Statutes are to the 2009-10 version unless otherwise noted. The time period in question spans six versions of the statutes, but the relevant provisions are the same in the biannual versions of the statutes; that is, the 2007-08, 2009-10, 2011-12 and 2013-14 statutes.

The trial court found that the five Granville terminals are comparable properties and the parties do not dispute that finding.

See Metropolitan Assocs. v. City of Milwaukee , 2018 WI 4, ¶¶ 35, 38, 379 Wis. 2d 141, 905 N.W.2d 784 (upholding the use of mass appraisal techniques).

Originally, four of the five Granville Terminal owners filed separate actions against the City. The actions were later consolidated into this action. Only two of the five Granville Terminal owners are parties to this action. The other two owners withdrew their complaints prior to the trial. The fifth Granville terminal owner was never a party in this action.

The bulk truck loading area, also referred to a truck rack, is essentially a gas pump that is connected to various bulk storage tanks on the property.

This court made a similar analysis with regard to a surface parking lot in Allright Props., Inc. v. City of Milwaukee , 2009 WI App 46, ¶ 46, 317 Wis. 2d 228, 767 N.W.2d 567.

The Oil Companies make no assertion that any terminalling agreements are not at market rates.

These business contracts are referred to as throughput contracts.

Assessments of oil terminals often are expressed by reference to assessment per-barrel, which is arrived at by dividing the total assessment by the terminal's total capability. U.S. Oil Co. v. City of Milwaukee , 2011 WI App 4, ¶ 3 n.2, 331 Wis. 2d 407, 794 N.W.2d 904.

The sixteen sales include the three comparable Granville oil terminals.