**COURT OF APPEALS
DECISION
DATED AND FILED**

**December 7, 2023**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2022AP1934**

**STATE OF WISCONSIN**

Cir. Ct. No. 2020CV1290

**IN COURT OF APPEALS
DISTRICT IV**

VERITAS VILLAGE, LLC,

    PLAINTIFF-RESPONDENT,

 V.

CITY OF MADISON,

    DEFENDANT-APPELLANT.

APPEAL from an order of the circuit court for Dane County: DAVID CONWAY, Judge. *Reversed and cause remanded with directions.*

Before Blanchard, Graham, and Nashold, JJ.

¶1    GRAHAM, J.  Veritas Village, LLC, owns an apartment building in the City of Madison and it brought this action challenging the City's 2019

assessment of the property as excessive. *See* WIS. STAT. § 74.37(3)(d) (2021-22).[1] In its motion for summary judgment, Veritas abandoned its claim that its property was assessed in excess of its market value, and it conceded that the City's 2019 assessment represented the property's market value as of January 1, 2019. However, Veritas also claimed, and continues to argue on appeal, that the market value assessment of its property violates the uniformity clause of the Wisconsin Constitution, art. VIII, § 1, because recent sales data demonstrates that the City assessed other apartment properties at values that are lower than their recent sale prices. According to Veritas, this data demonstrates that its competitors in the "strata" consisting of apartment buildings were taxed based on approximately 80 percent of market value, and the uniformity clause mandates that Veritas receive the same discount. The circuit court granted summary judgment in Veritas's favor, concluding that its summary judgment materials establish a prima facie uniformity violation, and that the City's summary judgment materials do not rebut Veritas's prima facie case.

¶2      On de novo review, we conclude that Veritas's summary judgment materials do not establish that the City's market value assessment of Veritas's property violated the uniformity clause. We therefore conclude that the circuit court erred when it granted Veritas's motion for summary judgment and denied the City's cross-motion for summary judgment. We reverse the court's order and remand with directions to enter a judgment in the City's favor.

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version.

## BACKGROUND

¶3     The following facts are taken from the materials that were submitted in support of the parties' cross-motions for summary judgment and are undisputed unless otherwise noted.

¶4     Veritas owns a 189-unit luxury apartment building (the "Property" or the "Veritas Property") that is located in downtown Madison.  For the 2019 tax year, the commercial property assessor for the City originally assessed the Property's market value at $25,000,000.[2]

¶5     The City provides a two-step process for challenging its tax assessments.  In the first step, the taxpayer challenges the assessment with the board of assessors, which is comprised of appraisers associated with the assessor's office.  *See* MADISON GENERAL ORDINANCE § 33.03(2).  Then, in the second step,

---

[2] Wisconsin cases use the term "market value," and sometimes "fair market value," to mean "the amount the property could be sold for in the open market by an owner willing and able but not compelled to sell to a purchaser willing and able but not obliged to buy." *State ex rel. Levine v. Board of Rev. of Vill. of Fox Point*, 191 Wis. 2d 363, 372, 528 N.W.2d 424 (1995). *See also Wisconsin Property Assessment Manual* (2019) at G-4 (defining "market value" as "the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgably, and assuming the price is not affected by undue stimulus."). For consistency, we use the term "market value" throughout this opinion, and the term "full market value" to mean 100 percent of market value.

The Wisconsin Property Assessment Manual is published each year by the Wisconsin Department of Revenue pursuant to WIS. STAT. § 73.03(2a), and it "serves as the guide for uniform property assessment throughout the State." *Wisconsin Property Assessment Manual* at Introduction.  In this opinion, we refer to the Wisconsin Property Assessment Manual as the "Manual," and all references are to the 2019 version, available at https://www.revenue.wi.gov/documents/wpam19.pdf, which is the version relied on by the parties and the circuit court.  "WISCONSIN STAT. § 70.32(1) requires that assessors adhere to the Manual, absent conflicting law." *See State ex rel. Stupar River LLC v. Town of Linwood Portage Cnty. Bd. of Rev.*, 2011 WI 82, ¶23 n.15, 336 Wis. 2d 562, 800 N.W.2d 468.

the taxpayer can challenge the assessment with the board of review, which is an independent body comprised of citizens. *See* MADISON GENERAL ORDINANCE § 33.08(5); WIS. STAT. § 70.47. Here, Veritas challenged the 2019 assessment by filing an objection with the board of assessors (which increased the assessed value), and then ultimately by requesting a hearing with the board of review.

¶6 Following the hearing, the board of review effectively determined that the City's original 2019 assessment undervalued the Veritas Property, and that the board of assessors overvalued it. The board of review set the assessment at $28,500,000, which it determined represented the Property's market value.[3] The City imposed $642,850.59 in property taxes based on that assessed value, and Veritas paid that amount.

¶7 In June 2020, after filing a claim with the City that was disallowed, Veritas filed the underlying complaint in the circuit court pursuant to WIS. STAT. § 74.37(3)(d).[4] In its complaint, Veritas claimed that the market value of the Property as of January 1, 2019, was no more than $15,233,000, and therefore, the City's 2019 assessment was excessive because it exceeded market value. Additionally, Veritas claimed that, to the extent that the City's assessment

---

[3] During the board of assessors proceeding, the City offered a sales comparison analysis and an income analysis, both conducted by Michael Pudelwitts. Although the board of assessors adopted Pudelwitts's appraisal, it does not appear that the board of review relied on Pudelwitts's sales comparison analysis as the basis for setting Veritas's 2019 assessment at $28,500,000. Indeed, Veritas does not dispute that the board of review's determination was based on Pudelwitts's income analysis, and was not based on his sales comparison analysis. Therefore, the Pudelwitts sales comparison analysis is not at issue in this appeal.

[4] "An action filed pursuant to [WIS. STAT.] § 74.37 seeks a trial before the circuit court, and is distinct from a certiorari action." *Lowe's Home Ctrs., LLC v. City of Delavan*, 2023 WI 8, ¶23, 405 Wis. 2d 616, 985 N.W.2d 69. In contrast to a certiorari action, an excessive assessment action under § 74.37 "is not confined to the record before the board and new evidence may be presented." *Id.*, ¶23 n.11.

represented market value, the assessment violates the uniformity clause of the Wisconsin Constitution. In support of the alleged uniformity violation, Veritas alleged that other commercial properties in the City were assessed at less than their market value in 2019, meaning that Veritas was bearing "an unreasonably disproportionate share" of the tax burden in relation to its value.

¶8      In Veritas's expert witness disclosure, it provided a report prepared by Dominic Landretti, who is a real estate valuation consultant. In his report, Landretti focused exclusively on the alleged uniformity violation, and did not appraise the Property or offer an opinion of its market value. Landretti critiqued the City's assessment process, concluding that "the major issues and common thread … is the lack of supporting documentation of uniformity and the failure to follow the applicable Wisconsin Statutes, the [Manual], and [International Association of Assessing Officers] Standards."[5]  Landretti also conducted an assessment-to-sales ratio analysis, which compared the sale prices of apartment properties that were sold in 2017 and 2018 with their 2019 assessed values,

---

[5] WISCONSIN STAT. § 70.32(1) requires assessors to adhere to professionally acceptable standards of appraisal practice. One organization that provides guidance on such standards is the International Association of Assessing Officers (IAAO), and IAAO guidance was introduced as an exhibit to the summary judgment materials in this case. *See* International Association of Assessing Officers, *Standard on Ratio Studies* (2013), available at https://www.iaao.org/media/standards/Standard_on_Ratio_Studies.pdf (hereinafter "IAAO Standard").

ultimately determining that the assessments were not uniform.[6] We discuss Landretti's data and conclusions at greater length in the discussion below.[7]

¶9 In the City's expert witness disclosure, it provided two different opinions of the market value of the Property: the objection report that was prepared by Michael Pudelwitts during the board of assessors proceeding, which valued the Property at $29,820,000; and an appraisal by certified general real estate appraiser Brian Walsh, who also conducted an income analysis and opined that the market value of the Property was $35,600,000.

¶10 The deadline for disclosing expert rebuttal witnesses and reports passed, with neither side disclosing any rebuttal witnesses or reports. Both sides moved for summary judgment.

¶11 In support of its summary judgment motion, Veritas expressly abandoned its claim that the City's $28,500,000 assessment exceeded the market value of the Property. It instead focused exclusively on its uniformity claim. It argued that "the undisputed facts of the case"—which included the City's admission that the Property's market value was $28,500,000 and Landretti's unrebutted assessment-to-sales ratio analysis—established that the City "singled [Veritas] out" by assessing its property "at its full fair market value despite systematically undervaluing multifamily commercial real estate in the same

---

[6] Landretti also compared the per-unit tax rate of the Veritas Property with that of seven other downtown apartment properties, but Veritas did not rely on that analysis to support its summary judgment motion and we discuss it no further.

[7] Veritas also provided a report prepared by real estate appraiser and consultant Thomas Hamilton, but Veritas did not rely on Hamilton's analysis to support its summary judgment motion and we discuss it no further.

strata." According to Veritas, the 2019 assessment "inequitably placed Veritas at a competitive disadvantage by giving its competitors a discount on property taxes in direct contravention of the Uniformity Clause." Veritas asked the circuit court to grant its motion for summary judgment and, as a remedy, to "bring its 2019 property tax assessment in line with its direct competitors."

¶12    In the City's brief in support of its own motion for summary judgment, the City pointed out that Veritas abandoned any claim that the Property was assessed in excess of its market value. With respect to the uniformity claim, the City argued that, even construing all facts and reasonable inferences in Veritas's favor, the evidence Veritas offered is insufficient to substantiate a uniformity violation.

¶13    The circuit court determined that Landretti's expert report is prima facie evidence of a uniformity violation, and that the City failed to rebut Landretti's report with expert testimony. The court therefore denied the City's motion for summary judgment and granted summary judgment to Veritas. The court ordered the City to reduce Veritas's 2019 tax assessment by a specified percentage and to issue a refund of taxes paid consistent with that reduction, plus applicable interest. The City appeals.

## DISCUSSION

¶14    Under WIS. STAT. § 802.08(2), "summary judgment must be entered 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 410 N.W.2d 816 (1987). On appeal, "[w]e review an order for summary judgment de novo, using the same

methodology as the circuit court." *Yahnke v. Carson*, 2000 WI 74, ¶10, 236 Wis. 2d 257, 613 N.W.2d 102. The first step is to consider whether the plaintiff has stated a claim for relief. *Baumeister v. Automated Prod., Inc.*, 2004 WI 148, ¶12, 277 Wis. 2d 21, 690 N.W.2d 1. If so, we then consider whether the moving party has established a prima facie case, meaning that the moving party's evidence, if uncontroverted, is sufficient to show that the moving party is entitled to judgment as a matter of law. *Id.* If it has, we consider whether the nonmoving party has identified any factual issues that preclude a grant of summary judgment. *Id.*

¶15     Here, the City does not dispute that Veritas has stated a claim for relief, and neither party argues that there are any factual issues that preclude a grant of summary judgment. Instead, the parties' dispute focuses on whether Veritas's uncontroverted expert report establishes a uniformity violation as a matter of law.

¶16     The state constitution provides that "[t]he rule of taxation shall be uniform ...." WIS. CONST. art. VIII, § 1. This provision has been interpreted to require that "the method or mode of taxing real property be … applied uniformly to all classes of property within the tax district." *U.S. Oil Co., Inc. v. City of Milwaukee*, 2011 WI App 4, ¶23, 331 Wis. 2d 407, 794 N.W.2d 904 (citing *State ex rel. Hensel v. Town of Wilson*, 55 Wis. 2d 101, 106, 197 N.W.2d 974 (1972)).

¶17     The state statutes governing assessments seek to ensure uniformity by requiring that assessors value real property at "the full value which could ordinarily be obtained therefor at private sale," WIS. STAT. § 70.32(1), "using the 'best information' that the assessor can practicably obtain." *U.S. Oil Co.*, 331

Wis. 2d 407, ¶24 (citing *State ex rel. Levine v. Board of Rev. of the Village of Fox Point*, 191 Wis. 2d 363, 372, 528 N.W.2d 424 (1995)).[8]

¶18    "Even if an assessor utilizes the correct methodology in assessing a particular property, a municipality can still violate the Uniformity Clause if the resulting assessment is not uniform with other property assessments in the district." *U.S. Oil Co.*, 331 Wis. 2d 407, ¶25.  That is, under the uniformity clause, a taxpayer may challenge a market value assessment of the taxpayer's property if the taxing district (here, the City) has underassessed other properties in the district. *See Noah's Ark Fam. Park v. Board of Rev. of the Vill. of Lake Delton*, 210 Wis. 2d 301, 319-20, 565 N.W.2d 230 (Ct. App. 1997) *(Noah's Ark I)*, *aff'd*, 216 Wis. 2d 387, 573 N.W.2d 852 (1998) (*Noah's Ark II*).

¶19    However, a taxpayer faces a significant hurdle when challenging an assessment.  WISCONSIN STAT. § 70.49(2) provides:  "The value of all real property entered into the assessment roll to which such affidavit is attached by the assessor shall, in all actions and proceedings involving such values, be presumptive evidence that all such properties have been justly and equitably

---

[8] WISCONSIN STAT. § 70.32(1) "sets forth a hierarchical valuation methodology for arriving at a property's fair market value." *Lowe's*, 405 Wis. 2d 616, ¶27, (citing *State ex rel. Markarian v. City of Cudahy*, 45 Wis. 2d 683, 685-86, 173 N.W.2d 627 (1970)).  The statute identifies "three sources of information that inform tax assessments," and the methodology "has been described as providing three 'tiers' of analysis." *Lowe's*, 405 Wis. 2d 616, ¶28 (citations omitted).  A tier 1 analysis examines a recent arm's-length sale of the property that is being assessed. *Id.*, ¶29 ("An arm's-length sale of the subject property is the best information of a property's fair market value, and is thus the first source of information to which an assessor should look in conducting an assessment.").  A tier 2 analysis "examin[es] recent arm's-length sales of reasonably comparable properties." *Id.*  Finally, a tier 3 analysis "may consider all the factors collectively that have a bearing on the value of the property." *Id.*, ¶30.  It includes, among other things, the "income approach, which seeks to capture the amount of income the property will generate over its useful life." *Adams Outdoor Advert., Ltd. v. City of Madison*, 2006 WI 104, ¶35, 294 Wis. 2d 441, 717 N.W.2d 803.

assessed in proper relationship to each other." This concept is referred to as the "presumption of correctness," *Metropolitan Associates v. City of Milwaukee*, 2018 WI 4, ¶50, 379 Wis. 2d 141, 905 N.W.2d 784, and taxpayers must overcome it when challenging their assessments. The presumption may be overcome if the taxpayer establishes that the assessment does not apply the principles set forth in the Manual or if the taxpayer presents significant contrary evidence. *Bonstores Realty One, LLC v. City of Wauwatosa*, 2013 WI App 131, ¶¶5, 9, 351 Wis. 2d 439, 839 N.W.2d 893 (citation omitted).

¶20 Recall that the Veritas Property was assessed at $28,500,000, and that value was entered into the assessment roll for the City. Therefore, the City's assessment of the Property is entitled to the presumption of correctness. As noted, Veritas has abandoned its claim that the City assessed the Property in excess of market value, conceding for purposes of this appeal that the 2019 assessed value equals market value. To prevail in its uniformity challenge, Veritas must present evidence of a uniformity violation, which is needed to rebut the presumption that all properties in the taxing district have been justly and equitably assessed. *See U.S. Oil Co.*, 331 Wis. 2d 407, ¶21.

¶21 In the discussion that follows, we summarize case law addressing what a taxpayer must prove to establish a uniformity violation. We then consider whether Landretti's analysis, which is the evidence Veritas relies on to support the alleged uniformity violation, is sufficient to satisfy that burden of proof.

## I. The Law on Uniformity Violations

¶22 As noted, the state constitution requires "the rule of taxation" to "be uniform." WIS. CONST. art. VIII, § 1. The underlying purpose of this provision is to promote a regime in which all property owners pay taxes in an equal proportion

to the full value of their property, and to ensure that assessments do not discriminate against individual property owners or classes of property. *Knowlton v. Board of Supervisors of Rock Cnty.*, 9 Wis. 410, 420 (1859) ("when property is the object of taxation, it should all alike, in proportion to its value, contribute towards paying the expense of such benefits and protection"); *see also Manual* at 9-10.

¶23    According to the Manual, "[u]niformity occurs when all property is assessed at full value or when all [statutory] classes of property are assessed at the same percentage of full value."[9]  *Manual* at 9-9.  That said, Wisconsin cases also recognize that "perfect uniformity of taxation is not obtainable."  *Noah's Ark II*, 216 Wis. 2d at 394; *see also Manual* at 9-9 ("[A]ppraising is not an exact science" and "there will always be variances in individual properties.  The ideal of every single property being valued at exactly 100% of its value … is a practical impossibility.").

¶24    Generally speaking, the uniformity clause may be violated if a property, or a class of property, is assessed at market value and other property in the taxing district is undervalued—this results in an excessive tax burden on the taxpayer whose property was assessed at market value.  *See Levine*, 191 Wis. 2d at 371-72; *Walthers v. Jung*, 175 Wis. 58, 61, 183 N.W. 986 (1921); *Allright Props., Inc. v. City of Madison*, 2009 WI App 46, ¶54, 317 Wis. 2d 228, 767 N.W.2d 567.  A taxpayer's uniformity challenge may prevail if the taxpayer can

---

[9] We understand the term "statutory class" to refer to the following classes of property set forth in WIS. STAT. § 70.05(5)(a)1m.:  residential; commercial (which the Manual defines to include apartments with more than four units, *Manual* at 13-1); undeveloped; agricultural forest; productive forest; personal property; and other.

demonstrate that other comparable properties, whether of the same or a different class, were assessed significantly below market value as compared to the taxpayer's property. *Noah's Ark I*, 210 Wis. 2d at 317-18; *see also* *U.S. Oil Co., Inc.*, 331 Wis. 2d 407, ¶25 (citing *Allright Props., Inc.*, 317 Wis. 2d 228, ¶52).

¶25 However, and importantly, a taxpayer cannot "succeed on a uniformity claim simply by 'selectively picking a few low comparison assessments and then complaining that [the taxpayer's] property was overassessed.'" *Allright Props., Inc.*, 317 Wis. 2d 228, ¶58 (citing *Levine*, 191 Wis. 2d at 375). And this is for good reason—if such challenges were successful, "assessments [would] have … precarious stability, because common knowledge informs us that the average taxpayer can conscientiously testify that [their] holdings are valued too high in comparison with that of certain … neighbors." *Walthers*, 175 Wis. at 60-61. Instead, a taxpayer must demonstrate "such a general undervaluation of the other property [in] the assessment district as will result in an excessive tax as to" the taxpayer whose property was assessed at market value. *Id.* at 61; *see also* *State ex rel. Algoma Hous. Co., v. Board of Rev.*, 166 Wis. 2d 675, 682, 480 N.W.2d 786 (Ct. App. 1991).

¶26 As more fully described in the following paragraphs, uniformity challenges tend to fall into three general categories: cases in which the assessor singled out the subject property for a discriminatory reassessment; cases in which the assessor used an "arbitrary and improper" assessment methodology that systematically undervalued other properties in the district as compared to the taxpayer's property; and cases in which the taxpayer attempts to prove a uniformity violation based exclusively on "a general underassessment of other property in the district."

¶27    As noted, one way in which a taxpayer can demonstrate a uniformity violation is by proving that the assessor "singled out" the taxpayer's property for reassessment while at the same time declining to reassess other properties in the district. *Noah's Ark II*, 216 Wis. 2d at 393. Many of the successful challenges reflected in our case law fall into this category.

¶28    In the *Noah's Ark* case, for example, the assessor singled out a waterpark for reassessment based on its recent sale price, which was significantly higher than its prior assessment. *Noah's Ark II*, 216 Wis. 2d at 388-89, 391; *see also Noah's Ark I*, 210 Wis. 2d at 306-07. At the same time, the assessor declined to reassess other non-waterpark commercial properties that were recently sold based on their sale prices. *Noah's Ark II*, 216 Wis. 2d at 388-89, 391; *see also Noah's Ark I*, 210 Wis. 2d at 306-07. Our supreme court affirmed the court of appeals' determination that this disparate treatment was sufficient to prove a uniformity violation. *Noah's Ark II*, 216 Wis. 2d at 393; *see also Hensel*, 55 Wis. 2d at 105 (rejecting the premise that "the sale price of one piece of property can be used to greatly increase its assessment while using a much lower valuation for other comparable property which has not had a recent sale").

¶29    Likewise, in *U.S. Oil*, 331 Wis. 2d 407, the assessor initially assessed U.S. Oil's oil terminals, as well as a number of comparable oil terminals, based on a recent sale price of the U.S. Oil property. *Id.*, ¶¶3-4. The assessor then reassessed the U.S. Oil terminals using a different methodology, the income approach, *id.*, ¶6, but declined to reassess other identical oil terminals using that same methodology, *id.*, ¶9. On appeal, we determined that the uniformity clause was violated when the assessor "'singl[ed] out' U.S. Oil" for reassessment under a different methodology, resulting in a per-barrel value that was more than double the per-barrel assessments of "every other [comparable] property." *Id.*, ¶27.

¶30    Here, the brief that Veritas filed in the circuit court asserted that the City "singled [the Property] out" for disparate treatment. However, Veritas did not provide any evidence that the Property was singled out for reassessment. *Cf. Noah's Ark II*, 216 Wis. 2d at 393. Now, on appeal, Veritas does not appear to renew the argument that the Property was singled out. Indeed, Veritas does not cite the *U.S. Oil* opinion in its appellate briefing except in a block quote of a portion of the circuit court's decision, and it argues that other cases, including the *Noah's Ark* opinions, are "inapplicable by [their] own express terms."

¶31    Another way in which a taxpayer can demonstrate a uniformity violation is by proving that an assessor used an "arbitrary and improper" assessment methodology that systematically undervalued other properties in the district as compared to the taxpayer's property. Other successful challenges reflected in our case law fall into this category.

¶32    In *Levine*, 191 Wis. 2d 363, for example, the taxpayers challenging their assessments owned newly constructed homes that were assessed based on recent arm's-length sales. *Id.* at 367, 370-71. When challenging their assessments, the taxpayers introduced evidence of the sale prices of four older homes in the district, which were assessed at values that were far lower than their recent sale prices. *Id.* at 368. When asked to explain the discrepancy, the assessor "testified that he did not rely on sales prices to determine the fair market value of certain older homes because, in his opinion, the purchasers of those homes were overpaying," and he acknowledged that his methodology for assessing older homes was "arbitrary." *Id.* Our supreme court determined that the taxpayers had proven a uniformity violation by introducing "ample" and "uncontroverted" evidence of "an arbitrary assessment methodology that entailed improper considerations" and that resulted in the general underassessment of "older

properties in the tax district." *Id.* at 376; *see also id.* at 372 (explaining that "the general underassessment of older properties would constitute discrimination against purchasers of newer properties and, therefore, would violate the uniformity clause").

¶33  Likewise, in *State ex rel. Boostrom v. Board of Rev. of Town of Linn*, 42 Wis. 2d 149, 166 N.W.2d 184 (1969), the owners of lakefront properties that were zoned for and assessed based on residential use challenged their assessments following a districtwide reassessment. *Id.* at 151-53, 157. In conducting the reassessment, the assessor used a methodology to assess residential lakefront properties that, on average, doubled their value from the prior assessments. *Id.* at 158. By contrast, the assessor took the former assessed value of agricultural land and "arbitrarily" increased it by 40 percent. *Id.* at 152, 158. Following the reassessment, state department of taxation figures indicated that the residential land in the district was assessed at a rate of 44.26 percent of full value and agricultural land was assessed at a rate of 31.57 percent of full value. *Id.* at 159. Our supreme court determined that "there was a pattern of unequal under-assessment of agricultural land as contrasted to residential land," and that the disparity was "substantial enough to result in an unequal burden of property taxation in violation of the uniformity clause." *Id.* at 160.

¶34  Here, Veritas cites to *Levine* throughout its briefing as the relevant precedent upon which its challenge is based. However, Veritas does not purport to identify any arbitrary or improper factors that the City used to assess other properties. Thus, Veritas does not persuade us that its challenge is like the challenges in *Levine* and *Boostrom*, in which the taxpayers were able to prove that an improper assessment methodology systematically undervalued other properties in the district.

¶35    Finally, Wisconsin cases also hold out the possibility that a taxpayer might be able to successfully challenge a market value assessment of its property under the uniformity clause, even in the absence of evidence that the assessor singled out its property for special treatment or used an arbitrary or improper assessment methodology that systematically undervalued other properties. *Walthers*, 175 Wis. 58; *Algoma Hous. Co.*, 166 Wis. 2d 675; *Allright Props., Inc.*, 317 Wis. 2d 228.  To this end, the taxpayer must demonstrate "such a general underassessment of property in the assessment district" as compared to the subject property "as will result in an excessive tax as to" the taxpayer challenging its assessment.  *Walthers*, 175 Wis. at 61.  Yet, it appears that such cases are rarely successful.  *Id.*; *see also Algoma Hous. Co.*, 166 Wis. 2d 675; *Allright Props., Inc.*, 317 Wis. 2d 228.

¶36    *Walthers* is the seminal case on this topic.  In *Walthers*, taxpayers challenged the assessments of their parcels as being "relatively too high when compared with" nine other parcels in the taxing district.  *Walthers*, 175 Wis. at 60; *see also id.* at 59 ("the only evidence" was provided by Walthers, who "introduced in evidence the assessments of nine other tracts of land in [the] town and testified that[,] in proportion to the assessments placed on such other tracts of land[], the assessment on [the subject property] was too high").  Our supreme court determined that this evidence did not demonstrate a "general undervaluation of other property in this assessment district":

> A taxpayer has no complaint when a valuation which could ordinarily be obtained … at private sale is placed upon his property, unless there is such a general undervaluation of the other property of the assessment district as will result in an excessive tax as to him.  Such a situation is not shown by proof which compares the valuation of a taxpayer's property with [a small percentage] of the other property in the assessment district, unless it appears that improper

> considerations influenced the valuation of the objector's property ….

***Id.*** at 61. The court further explained that, even if Walthers' testimony supported a conclusion that the nine comparison properties "[were] assessed too low," it "falls far short of convincing proof that the valuation placed upon [the subject] property will result in an unjust tax upon [the subject property]." ***Id.***[10]

¶37 Similarly, in ***Algoma Housing Co.***, 166 Wis. 2d 675, the owner of an apartment complex attempted to prove a uniformity violation by comparing the per-square-foot assessment of its property with that of two "allegedly comparable pieces of property." ***Id.*** at 682. We rejected that analysis, concluding that, under the circumstances and based on ***Walthers***, uniformity must be established by showing "a general undervaluation of properties within the district." ***Id.*** (citing ***Walthers***, 175 Wis. 58).

¶38 Likewise, in ***Allright Properties***, 317 Wis. 2d 228, ¶3, the taxpayer owned a parcel near an airport that was used for surface parking. Its expert witness compared the price-per-square-foot assessment of the taxpayer's parcel to seven nearby parcels with the same commercial zoning, concluding that the other properties were underassessed. ***Id.***, ¶56. Citing ***Walthers***, we determined that the

---

[10] In ***Walthers***, the comparable properties comprised less than two percent of the taxable property in the district, and some subsequent courts, including the court of appeals in ***Levine***, interpreted ***Walthers*** to set a "bright-line two percent" evidentiary rule required for proving a general underassessment on a districtwide basis. ***Levine***, 191 Wis. 2d at 374-76 (discussing the court of appeals opinion on review in that case). However, on review, our supreme court rejected that interpretation of ***Walthers***. *See* ***id.*** at 375-76. In its opinion, our supreme court determined that ***Walthers*** had used "the two percent figure simply as a means of underscoring the inadequacy of the evidence presented by the complaining taxpayer in that case." ***Id.*** The court explained that there was no evidence that the assessor in ***Walthers*** singled out the subject property for reassessment or used arbitrary or improper considerations in assessing other properties in the tax district, ***id.*** at 377, and that "[s]uch a rigid rule would place an onerous burden on taxpayers who live in populous tax districts," ***id.*** at 375.

analysis was based on an "insignificant number of comparison properties" and "[did] not demonstrate a constitutional lack of uniformity." *Id.*, ¶57.

## II. Application to the Veritas Property

¶39 Here, as stated, Veritas has not presented evidence that the City singled out its property for reassessment or used an arbitrary assessment methodology in assessing other properties. Therefore, Veritas must demonstrate "such a general underassessment of [other] property in the assessment district" as compared to the Veritas Property "as will result in an excessive tax as to" Veritas. *See Walthers*, 175 Wis. at 61.

¶40 Throughout its circuit court briefing and on appeal, Veritas has maintained that it has established that the Property's 2019 assessment was at market value based on an admission that the City made in discovery.[11] Although the City disputes the effect of its admission, we assume without deciding that Veritas has established that the City assessed the Property at market value. Therefore, the remaining issue is whether Veritas has proven a "general undervaluation" of other property in the assessment district. *See supra*, ¶¶35-38.

¶41 In an attempt to make this showing during the circuit court proceedings, Veritas presented its brief in support and Landretti's expert analysis.

---

[11] Specifically, Veritas cites the City's response to a request to admit, in which the City admitted that "the Property's January 1, 2019 fair market value for property tax assessment purposes as defined by [the Manual] was $28,500,000." By way of explanation, the City cited *State ex rel. City of Waukesha v. City of Waukesha Board of Review*, 2021 WI 89, ¶¶40-45, 399 Wis. 2d 696, 967 N.W.2d 460, and further explained that the City has no statutory right to appeal an assessment that was set by the board of review pursuant to WIS. STAT. § 70.47(9)(a). As we understand this response, the City admitted that the Property was assessed at market value on the ground that it had no right or ability to obtain a court-ordered increase in the assessment.

In its response brief, the City critiqued Landretti's analysis and conclusion, but did not present any expert report or testimony to rebut it. To be sure, the lack of rebuttal evidence from an expert contributed to the circuit court's determination that Landretti's analysis was sufficient to establish a uniformity violation. Nevertheless, we are not persuaded that the City was required as a matter of law to present expert testimony in order to survive Veritas's motion for summary judgment.[12] Even without the assistance of expert rebuttal testimony, we conclude that Veritas's summary judgment materials, although undisputed, fail to demonstrate a general undervaluation of other property in the district.

## A.

¶42 We begin by observing that, in the circuit court and now on appeal, Veritas has maintained that the pertinent question is whether "the City generally under-assessed other properties *in its strata*," (emphasis added), which it identifies as multifamily housing and, more specifically, apartments. According to Veritas, if it can demonstrate that "other properties in its strata" are generally

---

[12] *See* ***Racine Cnty. v. Oracular Milwaukee, Inc.***, 2010 WI 25, ¶29-30 & n.9, 323 Wis. 2d 682, 781 N.W.2d 88 (explaining that, in some instances, an issue may be so "unusually complex or esoteric" that expert testimony is required to survive summary judgment, but in other cases, expert testimony is not required (citation omitted)).

On a related note, Veritas appears to argue that the City is precluded from critiquing Landretti's analysis or conclusions because the City did not file a motion pursuant to WIS. STAT. § 907.02 to exclude Landretti's opinion testimony. This argument is unavailing. A motion under § 907.02 challenges the admissibility of an expert opinion on the ground that the opinion is not based upon sufficient facts or data, is not the product of reliable principles and methods, or the expert has not applied the principles and methods reliably to the facts of the case. But the fact that an expert opinion is not deemed to be so unreliable as to be inadmissible does not mean that the court is bound to give it conclusive weight. *See* ***Seifert v. Balink***, 2017 WI 2, ¶132, 372 Wis. 2d 525, 888 N.W.2d 816 (distinguishing between the weight that should be given to expert opinion testimony and its admissibility).

underassessed by a certain percentage, uniformity requires that the Veritas Property be underassessed by the same percentage.[13]

¶43 Veritas has not cited any Wisconsin case to support its argument that the pertinent question is whether the City generally underassessed other properties

---

[13] Neither the Manual nor the statutes define the term "strata." Based on the Manual and other guidance from the IAAO, we infer that, in the assessment context, the term refers to a group of properties that share a common characteristic, and that a "stratification" process may be used to identify problem areas in a district and to evaluate whether reassessment is needed. The IAAO provides:

> Stratification divides all the properties within the scope of the study into two or more groups or strata. Stratification facilitates a more complete and detailed picture of appraisal performance and can enhance sample representativeness.

> Each type of property subject to a distinct level of assessment could constitute a stratum. Other property groups, such as neighborhoods and age and size ranges, could constitute additional strata.

> When the purpose of the study is to evaluate appraisal quality, flexibility in stratification is essential. The general goal is to identify areas in which the assessment levels are too low or lack uniformity and property groups for which additional reappraisal work may be required. In such cases, it also is highly desirable to stratify on the basis of more than one characteristic simultaneously.

> Stratification can help identify differences in level of appraisal between property groups. In large jurisdictions, stratification by geographic areas is generally more appropriate for residential properties, while stratification of commercial properties by either geographic area or property subtypes (e.g., office, retail, and warehouse/industrial) can be more effective.

IAAO Standard, *supra*, at 10. Landretti's discussion of the stratification process is consistent with this description. He states that "[e]fforts by the assessor to define and analyze various substrata can focus the attention of the assessor on those substrata that are in need of revaluation and prevent the assessor from spending time and effort on those areas that already meet the criteria of market value assessment."

in a strata to which Veritas belongs.[14] It instead cites an excerpt from the Manual's discussion of uniformity, which provides:

> There are circumstances where the assessment process has resulted in non-uniform treatment of properties on the roll. The uniformity clause is violated where the assessor has significant differences between assessment to full value ratios of statutory classes (residential as compared to commercial or personal property, for example), or strata within a statutory class (on water vs. off water residential; newer vs. older homes).

*Manual* at 9-10.

¶44     For its part, the City vigorously disputes that Veritas can substantiate a uniformity violation with a statistical analysis that is limited to a single stratum or substratum within the statutory class of commercial property. According to the City, Veritas is required to demonstrate a districtwide undervaluation, and municipalities would be overrun with costly litigation if taxpayers could substantiate a uniformity violation merely by proving that a handful of properties, within some defined strata of common characteristics, were underassessed.

---

[14] In the brief that Veritas filed in the circuit court, it relied on *Great Lakes Quick Lube LP v. City of Milwaukee*, 2011 WI App 7, ¶31, 331 Wis. 2d 137, 794 N.W.2d 510, and *State ex rel. Algoma Housing Co. v. Board of Review*, 166 Wis. 2d 675, 682, 480 N.W.2d 786 (Ct. App. 1991), for this premise. Citing these two cases, Veritas argued: "a lack of uniformity can certainly be established by showing 'a general undervaluation of properties within [a strata] when the subject has been assessed at full market value.'" (citing *Great Lakes Quick Lube*, which cited *Algoma Housing Co.*, brackets in Veritas's circuit court brief.) Yet, neither the *Great Lakes Quick Lube* opinion nor the *Algoma Housing Co.* opinion address a "general undervaluation of properties *within a strata*," as the altered quotation in Veritas's circuit court brief purported to represent. Instead, both opinions simply repeat the now-familiar position that a lack of uniformity can be established by showing "a general undervaluation of properties *within a district* …." *Great Lakes Quick Lube*, 331 Wis. 2d 137, ¶31 (citing *Algoma Hous. Co.*, 166 Wis. 2d at 682) (emphasis added and brackets removed).

¶45   We need not resolve this dispute between the parties in order to decide this appeal. Instead, we assume without deciding that Veritas might be entitled to some form of relief if it could prove a general underassessment of the apartment strata. Even with that assumption in its favor, we conclude, for reasons we discuss in the following section, that Veritas's summary judgment materials do not establish a prima facie case that apartment properties in the District are generally underassessed.

**B.**

¶46   To substantiate a uniformity violation, Veritas relies on Landretti's expert report. In the course of preparing this report, Landretti obtained data from the City regarding 37 apartment properties that were sold in 2017 or 2018. As we understand it, these 37 sales represented most but not all of the apartment properties in the City that were sold in those years. Using these data, Landretti conducted what the Manual refers to as an "assessment [to] sales ratio analysis," which compares the City's 2019 assessment of each of these 37 properties with its sale price from 2017 or 2018.[15] The data that Landretti relied on are set forth in a spreadsheet that he included in his report, which we have reproduced as an exhibit to this opinion.

¶47   According to Landretti's spreadsheet, of these 37 properties, 31 were assessed at a value that is greater than 99 percent of the property's sale price. More specifically, the spreadsheet reflects that one was assessed at 99.6 percent of

---

[15] The Manual explains that "[t]he major goal of the assessment/sales analysis is to measure assessment performance," *Manual* 10-41 (emphasis omitted), and that ratios calculated in an assessment-to-sales analysis are statistical measures that can be used by an assessor to "achieve better assessment uniformity within the municipality," *Manual* 10-51.

its sale price; another was assessed at 99.9 percent of its sale price; 22 were assessed at 100 percent of their sale prices; and seven were assessed at a value between 100.8 and 125 percent of their sale prices. Of the remaining six properties, each has an assessed value that is less than 92 percent of its sale price—sometimes significantly less.[16]

¶48 Accordingly, the vast majority of the properties that Landretti considered (31 of 37) have an assessed value greater than 99 percent of their sale prices. This fact is generally reflected in Landretti's calculation of the "mean sales ratio" at 97.8 percent,[17] and in his calculation of the "median sales ratio" at 100 percent.[18] Both of these ratios are "measures of central tendency," *Manual* at 10-38 to 10-41, and Landretti acknowledges that neither of these ratios suggests a uniformity problem within the apartment strata.

---

[16] Although it is not clear from the summary judgment record, there might be reasons, which are reflected in a recent department of revenue bulletin, that the City's assessment of a given property is not the same as the property's recent sale price. *See Attention Assessors – Clarification on Assessment Topics, Use of Sales to Update Assessments* (October 27, 2023), https://www.revenue.wi.gov/Pages/SLF/Assessor-News/2023-10-27.aspx. In this bulletin, the department of revenue advises that, when conducting "maintenance assessments," *see Manual* at 4-1, assessors should not use recent sales data to update assessments.

[17] The IAAO uses the term "mean sales ratio" to refer to the "arithmetic mean." IAAO Standard, *supra*, at 14. The IAAO defines this term as "the average of the ratios," which is calculated by adding all the ratios and dividing that sum by the total number of ratios. *Id.*; *see also Manual* at 10-39.

[18] The IAAO defines the "median [sales] ratio" as "the middle ratio when the ratios are arrayed in order of magnitude," that is, from smallest in value to largest in value. IAAO Standard, *supra*, at 14. It further explains that the median "is less affected by extreme ratios than the other measures of central tendency." *Id.* As a result, the IAAO identifies the median as "the generally preferred measure of central tendency for evaluating overall appraisal level, determining reappraisal priorities, or evaluating the need for a reappraisal." *Id.*

¶49 Turning to the six outlier properties, the data Landretti analyzed shows that these six properties are all larger value (meaning more expensive) properties, with four of the six having an assessed value of more than $25,000,000. What this means is that, assuming that the 37 apartment properties that were sold in 2017 and 2018 are representative of all apartment properties in the district, and also assuming that the sale price of each of these properties reflects the property's market value, the City's assessments are "regressive."[19] That is, generally speaking, taxpayers owning larger value apartment properties pay less in proportion to their value than taxpayers owning lower value properties. This conclusion is expressly stated in Landretti's report, which analyzes a metric referred to as the "price related differential." According to Landretti's calculation, the price related differential for the apartment strata is 1.18, which Landretti opines is high, and thus means that the City's assessments of apartment properties

---

[19] That the sale prices of the 37 properties equal their market value is an unstated premise underlying Landretti's analysis. But Landretti has not undertaken any analysis to support this premise, except to assert that, generally speaking, "the sale of the subject is the best evidence of market value." It is true that sale price is generally considered to be the "best evidence" of market value. *Flood v. Village of Lomira, Bd. Of Rev.*, 153 Wis. 2d 428, 437, 451 N.W.2d 422 (1990). However, it is not necessarily true that sale price is determinative of market value. Wisconsin case law reflects that there are a number of reasons that a property's market value may be significantly more or less than its sale price. *See id.* at 436-38 (concluding that favorable financing terms may have inflated the sale price beyond the amount that would "ordinarily" be obtained for the property "under normal conditions," and stating that "various circumstances in an arm's-length transaction may mean that the sale price is not the best information of the full value of the real property" (citation omitted)).

In this case, Landretti's spreadsheet reflects that the assessment for each of the six outlier properties was challenged by the taxpayer at the board of assessors, the board of review, or both. Landretti's analysis does not take into account the possibility that the City may have assessed some or all of these properties at a value that is less than the sale price because a determination was made (by the assessor or the board of review) that the sale price was significantly greater than market value.

"are significantly regressive," with "larger value properties … being under assessed as compared to lower value properties."

¶50     Veritas contends that Landretti's statistical analysis proves that the apartment strata, *as a whole*, suffers from a lack of uniformity.   Yet, this contention is not borne out in Landretti's calculation of mean sales ratio (97.8 percent) or his calculation of median sales ratio (100 percent).   Instead, Veritas's theory rests on the "aggregate ratio" for these 37 properties, which Landretti calculated at 83.2 percent.[20]  We conclude that, under the circumstances, this aggregate ratio is insufficient to prove a "general underassessment" of the apartment strata in the City.

¶51     To calculate aggregate ratio, Landretti took the sum of the assessed values of all 37 properties and divided that dollar amount by the sum of the sale prices for all 37 properties.  *See generally Manual* at 10-39.   Using this formula, he arrived at an aggregate ratio of 83.2 percent.   However, Veritas has not identified any case in which a taxpayer has prevailed on a uniformity challenge based on a calculation of aggregate ratio, or on any analogous concept.

¶52     Indeed, the Manual specifically cautions that "[a]verages can be misleading," and that aggregate ratios are especially susceptible to being misunderstood and misapplied.  *Manual* at 10-38 and 10-39.   As the Manual

_____

[20] According to the IAAO, "aggregate [sales] ratio" has the same meaning as the "weighted mean ratio" and is defined as "the value-weighted average of the ratios in which the weights are proportional to the sales prices."  IAAO Standard, *supra*, at 14.  In contrast to the median and mean, which give equal weight to *each property* in the sample, "[t]he weighted mean gives equal weight to *each dollar of value* in the sample."  **Id.** (emphasis added).  The IAAO explains that, "[t]he weighted mean is an important statistic in its own right and also is used in computing the [price related differential]," which is "a measure of uniformity between high- and low-value properties."  **Id.**; *see also Manual* at 10-39 to 10-40.

further explains, aggregate ratios are "very sensitive to extreme ratios if the extreme sales are large value properties" (as they are in this case) because "large dollar value sales count more heavily than small dollar value sales," *Manual* 10-40, such that a single $200,000 sale "counts ten times as much as a $20,000 sale," *Manual* 10-39. For that reason, the Manual warrants that an aggregate ratio "may not be typical" of the strata it purports to represent. *Manual* 10-39. It is for this same reason that the IAAO advises that the median, rather than the aggregate ratio, "is the generally preferred measure of central tendency for evaluating overall appraisal level, determining reappraisal priorities, or evaluating the need for a reappraisal." IAAO Standard, *supra*, at 14.

¶53     Here, as reflected in Landretti's spreadsheet (which, again, is attached as an exhibit to this opinion), the fact that the aggregate ratio for the 37 properties falls below 100 percent is completely attributable to the six properties described above, each of which has a disproportionately high sale price and an assessed value that is significantly below its sale price. In other words, the data do not reflect a "general undervaluation" of apartment properties as compared to their sale prices. At best, the aggregate ratio calculation gives a numeric value to the conclusion that is apparent from viewing the data in Landretti's spreadsheet—the City assessed the vast majority of properties at or above their sale price, and the undervaluation, if any, is concentrated in six large value properties, to which the calculation of aggregate ratio by its very nature gives disproportionate weight.

¶54     This is reflected in Landretti's ultimate conclusion, which is much more limited than the conclusion drawn in Veritas's briefing. Landretti does not conclude that the Veritas Property is overvalued in comparison to the strata of apartments in the City, as Veritas contends in its brief. Rather, Landretti concludes that, "if the subject property is valued using the sale price of other high

valued [apartment] properties, it is overvalued as compared to other higher valued [apartment] properties."

¶55  Therefore, our examination of Landretti's statistical analysis demonstrates that Veritas's challenge to its 2019 assessment is based on comparing the Veritas Property to six properties that were potentially assessed at less than full market value.  Under the pertinent case law, this is insufficient to prove a "general undervaluation of other propert[ies in] the assessment district." *See Walthers*, 175 Wis. at 61.  Like the court in *Allright Properties*, we conclude that Veritas's evidence is based on an "insignificant number of comparison properties" and "does not demonstrate a constitutional lack of uniformity." *Allright Props.*, 317 Wis. 2d 228, ¶57; *see also Great Lakes Quick Lube LP*, 331 Wis. 2d 137, ¶31 ("[s]imply comparing a taxpayer's appraised value to lower values assigned to a relatively small number of other properties has long been rejected as a claimed violation of the uniformity clause").

¶56  Accordingly, we conclude that Veritas has not made a prima facie case that the 2019 assessment violates the uniformity clause, and that the circuit court erred when it granted summary judgment in Veritas's favor.

¶57  Turning to the City's cross-motion for summary judgment, we conclude that it should be granted.  Although Veritas claimed in its complaint that the 2019 assessment exceeded the Property's market value, Veritas has not provided any support for that claim, which, in any event, it has abandoned.  And we have determined that Veritas's expert's analysis fails to demonstrate that the

2019 assessment violates the uniformity clause. Accordingly, we conclude that the City is entitled to judgment as a matter of law on that basis.[21]

*By the Court.*—Order reversed and cause remanded with directions.

Not recommended for publication in the official reports.

---

[21] To the extent that we have not specifically addressed any other arguments made by the parties, we have determined that we need not address them here, either because the arguments are undeveloped, *see State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992), or because we have decided the appeal on other dispositive grounds, *see Barrows v. American Family Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013).

City of Madison - Commercial Sales Data Base 2017 and 2018 – Apartment and Apartments [132]

| Sale # | Area | Parcel Number | Situs | Document # | Description | Sale Date | Sale Price | 2019 Assessment | 2019 Assessment to Sale Rat | Board of Assessors or Review |
|---|---|---|---|---|---|---|---|---|---|---|
| 2017-131 | 9936 | 0709-232-2933-4 | 110 N Bedford St | 5312662 | Apartments | 03/01/17 | $57,000,000 | $33,755,000 | 59.2% | Yes - 2018 |
| 2017-127 | 9936 | 0709-231-1722-4 | 306 W Main St | 5341401 | Apartments | 07/13/17 | $42,200,000 | $32,863,000 | 77.9% | Yes - 2018 |
| 2017-069 | 9931 | 0709-143-0213-1 | 502 N Frances St | 5376681 | Apartment | 11/29/17 | $32,501,124 | $25,650,000 | 78.9% | Yes |
| 2018-003 | 9936 | 0709-231-1427-0 | 433 W Johnson | 5384796 | Apartments | 01/16/18 | $31,335,504 | $25,370,000 | 81.0% | Yes |
| 2018-039 | 9921 | 0708-351-0203-2 | 1202 McKenna Blvd | 5403582 | Apartments | 04/19/18 | $10,650,000 | $8,930,000 | 83.8% | Yes |
| 2018-018 | 9937 | 0709-134-0714-8 | 902 Williamson St | 5409710 | Apartments | 05/08/18 | $6,450,000 | $5,910,000 | 91.6% | Yes |
| 2017-068 | 9931 | 0709-144-2012-3 | 505 N Frances St | 5375390 | Apartment | 11/30/17 | $11,040,000 | $11,000,000 | 99.6% | |
| 2017-008 | 9921 | 0608-012-2010-8 | 18 N Wickham Ct | 5303645 | Apartments | 01/31/17 | $512,300 | $512,000 | 99.9% | |
| 2017-098 | 3110 | 0809-264-0313-2 & 0809-264-0314-0 | 33 & 41 Northridge Terrace | 5345681 | Apartments | 07/31/17 | $2,433,000 | $2,432,000 | 100.0% | |
| 2018-013 | 9938 | 0709-353-0207-9 & 0709-353-0208-7 | 5-13 Adeline Cir | 5420715 | Apartments | 05/31/18 | $1,045,035 | $1,045,000 | 100.0% | |
| 2017-027 | 9925 | 0609-052-0413-1 | 2202-2206 Allied Dr | 5368036 | Apartments | 10/26/17 | $410,000 | $410,000 | 100.0% | |
| 2017-077 | 3112 | 0810-323-0511-3, 0512-1, 0511-3 | 3205, 3209 & 3213 Ridgeway Ave | 5296269 | Apartments | 01/03/17 | $1,350,000 | $1,350,000 | 100.0% | |
| 2017-094 | 9912 | 0809-264-0316-6 | 57 & 58 Northridge Terrace | 5331197 | Apartments | 06/05/17 | $4,360,000 | $4,360,000 | 100.0% | |
| 2017-106 | 9913 | 0810-343-1301-5 | 833 Jana Lane | 5353612 | Apartments | 08/29/17 | $870,000 | $870,000 | 100.0% | |
| 2017-108 | 9912 | 0709-124-0091-1 | 1622 - 1750 Fordem Ave | 5368517 | Apartments | 10/30/17 | $8,954,100 | $8,954,100 | 100.0% | |
| 2017-113 | 9912 | 0810-323-1113-6 | 905 N Oak St | 5362763 | Apartments | 10/06/17 | $415,000 | $415,000 | 100.0% | |
| 2017-122 | 9915 | 0710-103-0906-3 & 0710-103-0908-9 | 4501-4509 Leo Dr | 5379020 | Apartments | 12/15/17 | $1,225,000 | $1,225,000 | 100.0% | |
| 2018-009 | 9925 | 0709-343-1009-9 | 2506 McDivitt Rd | 5384526 | Apartments | 01/17/18 | $3,067,000 | $3,067,000 | 100.0% | |
| 2018-010 | 9938 | 0709-353-0116-2 | 1121 W Badger Rd | 5416572 | Apartments | 06/12/18 | $505,000 | $505,000 | 100.0% | |
| 2018-012 | 9935 | 0709-144-1418-4 | 116 E Dayton St | 5408092 | Apartments | 05/03/18 | $615,000 | $615,000 | 100.0% | |
| 2018-017 | 9935 | 0709-144-1019-0 | 112 Langdon St | 5419883 | Apartments | 06/22/18 | $2,600,000 | $2,600,000 | 100.0% | |
| 2018-025 | 9921 | 0608-012-2025-7 & 0608-012-2027-3 | 6721-6753 Raymond Rd | 5454995 | Apartments | 11/12/18 | $1,220,000 | $1,220,000 | 100.0% | |
| 2018-026 | 9925 | 0609-032-0508-2 | 2029 Greenway Cross | 5407711 | Apartments | 05/08/18 | $1,610,000 | $1,610,000 | 100.0% | |
| 2018-042 | 9921 | 0709-182-1105-7 | 1705 Camus Ln | 5455565 | Apartments | 11/20/18 | $1,007,000 | $1,007,000 | 100.0% | |
| 2018-044 | 9921 | 0709-191-0102-5 | 5019 Old Middleton Rd | 5399051 | Apartments | 03/30/18 | $1,900,000 | $1,900,000 | 100.0% | |
| 2018-052 | 9925 | 0709-334-0101-3 | 2720 McDivitt Rd | 5421314 | Apartments | 06/27/18 | $2,300,000 | $2,300,000 | 100.0% | |
| 2018-080 | 9913 | 0810-281-0711-9 | 4414 Dwight Dr | 5421030 | Apartments | 06/25/18 | $907,000 | $907,000 | 100.0% | |
| 2018-096 | 9925 | 0609-052-0414-9 | 2118 Allied Dr | 5393050 | Apartments | 2/28/2018 | $400,000 | $400,000 | 100.0% | |
| 2017-109 | 9912 | 0709-124-0090-3 & 0709-124-0099-5 | 1614 Fordem Ave | 5368522 | Apartments | 10/30/17 | $27,856,972 | $27,857,000 | 100.0% | |
| 2018-002 | 9925 | 0709-343-0202-0 & 0709-343-0203-8 | 2609-2617 McDivitt Rd | 5398486 | Apartments | 03/29/18 | $831,900 | $832,000 | 100.0% | |
| 2017-002 | 9921 | 0608-014-1002-2 & 1315-9 | 3149-3150 Manchester Rd | 5326874 | Apartments | 05/15/17 | $1,637,500 | $1,651,000 | 100.8% | |
| 2017-001 | 9921 | 0608-012-2025-7 | 6753 Raymond Rd | 5303859 | Apartments | 01/31/17 | $1,105,000 | $1,120,000 | 101.4% | |
| 2017-064 | 9934 | 0709-133-3209-8 | 213 N Hamilton St | 5378471 | Apartment | 12/15/17 | $1,295,000 | $1,360,000 | 105.0% | |
| 2017-034 | 9931 | 0709-144-2120-4 | 212 W Gorham St | 5355438 | Apartment | 08/31/17 | $1,250,000 | $1,313,000 | 105.0% | |
| 2017-060 | 9935 | 0709-144-0409-4 | 115 E Gilman St | 5312088 | Apartments | 03/10/17 | $1,070,000 | $1,124,000 | 105.0% | |
| 2017-026 | 9938 | 0709-351-1304-6 | 102-106 Sunny Meade Ln | 5312214 | Apartments | 03/15/17 | $470,000 | $494,000 | 105.1% | |
| 2017-117 | 9912 | 0809-254-1591-4 | 1502 Troy Dr | 5375750 | Apartments | 11/30/17 | $7,000,000 | $8,750,000 | 125.0% | Yes |

---

[132] City of Madison valid sales from 2017 and 2018. Sale 2017-127 was reported as invalid for ratio purposes on the City's property record with no explanation. The sale included 65 parking spaces assessed at $17,200 each that were included in the total assessment above.